[Civ. No. 2461. Third Appellate District.—November 18, 1922.]

CLAUDE CIOLI, Respondent, v. SAMUEL KENOURGIOS et al., Appellants.

[1] FRAUDULENT CONVEYANCES—ACTION TO SET ASIDE—FINDINGS—EVIDENCE.—In this action brought to set aside certain conveyances alleged to have been made by one of the defendants to the other two, after the former had become liable to plaintiff as the result of an automobile collision, and after all the defendants had notice of institution of suit against them and summons had been served, the evidence was sufficient to support the findings of the trial court that the transfer was made for the purpose of defeating plaintiff's claim and for defeating creditors generally.

[2] Id.—Defendants as Witnesses—Rejection of Testimony.—The fact that plaintiff called the alleged conspirators to the witness-stand, as he was authorized to do under section 2055 of the Code of Civil Procedure, did not compel approval by him of their testimony, but he could use their appearance on the stand, their words, their acts—in fact anything they could furnish in his favor, and reject the rest.

[3] Id. — Notice of Claim — Grantees as Innocent Purchasers. — As soon as the automobile collision occurred plaintiff had a claim against the defendant who was driving it, and as soon as his brothers, the codefendants, to whom the conveyances were made, had notice of the claim they were no longer innocent third parties without notice; and, irrespective of whether plaintiff was a creditor as soon as the collision occurred, his rights were fully protected under section 3439 of the Civil Code, and he could not be deprived of his rights by a fraudulent conveyance.

[4] Id. — Adequacy of Consideration Immaterial — Character of Transaction—Circumstantial Evidence.—The fact that an adequate consideration might have been paid did not remove the taint of fraud from the transaction, where the conveyances were conceived and executed for the purpose of defeating plaintiff's claim against the grantor; and the character of the transaction was as properly proven by marshaling the circumstances surrounding it, and deducting therefrom the fraudulent purpose, when it manifestly appeared, as by presenting the more positive and direct testimony of actual purpose to deceive.

APPEAL from a judgment of the Superior Court of Sacramento County. Peter J. Shields, Judge. Affirmed.

The facts are stated in the opinion of the court.

J. M. Inman and Neil R. McAllister for Appellants.

Charles B. Harris for Respondent.

ANDERSON, J., *pro tem.*—This is an action brought by the plaintiff to set aside certain conveyances alleged to have been made by John Kenourgios to said Samuel Kenourgios and Frank Kenourgios for the purpose of defeating plaintiff's claim, and for defeating creditors generally. Judgment was rendered for the plaintiff, canceling and annulling the deed and bill of sale in controversy.

[1] The main contention of appellants is made on the ground of insufficiency of the evidence to sustain the alleged grounds of fraud. A brief statement of the evidence will

be necessary for the purpose of an examination of this contention.

It appears from the evidence that the three brothers, natives of Greece, came to Sacramento and formed a partnership to engage in the grocery and bakery business in that city. John (grantor and vendor herein) and Samuel came first, in 1915, and Frank joined them later. While associated in said business as such partners, on the fourth day of July, 1920, an automobile collision occurred in which the said Claude Cioli, plaintiff herein, was injured; the automobile, a borrowed one, was being driven by John, the other brothers not being present. On September 21, 1920, the attorney' for Cioli wrote to the three brothers, addressing the letter in the firm name of the defendants, the receipt of which letter was acknowledged, and one of the defendants—Frank, grantee herein—went to the office of the attorney for plaintiff in regard to the collision.

On the sixth day of July, 1920, all three defendants entered into a written agreement to purchase the real property in controversy, though payments had previously been made by them on the intended purchase; thereafter, on the sixteenth day of November, 1920, a deed was made of said property to Frank and Samuel, John's name being omitted from the deed. The next day the deed was recorded at the request of M. I. Welch, the then attorney for the defendants; but before this deed was executed and delivered notice of institution of suit and summons were served on the defendants on the twenty-ninth day of September, 1920.

Thereafter each defendant was in frequent consultation with Mr. Welch, attorney for defendants. Among. other things, the attorney was told that the collision occurred while John was out on a "joy ride"; that the automobile which he drove was a borrowed one; that the other two brothers were not in the machine, that they did not see the accident and knew nothing about it. Each defendant filed a separate answer, the one by John admitting that he was driving and in control, but denying negligence or liability; the answers of Samuel and Frank, respectively, denied everything on information and belief. The case was finally set for trial on January 25, 1921. About one week before the date set for trial Mr. Welch, the attorney for defendants, advised John to settle the case by paying the

plaintiff fifteen hundred dollars. In response to this, all three defendants offered to pay a total sum of one thousand dollars. The plaintiff, through his attorney, Mr. Harris, offered to settle the case against all three defendants for the total sum of fifteen hundred dollars. The defendants refused to act upon the advice of Mr. Welch, whereupon Mr. Welch refused to further represent either of them in the case. They then immediately employed Mr. McAllister, who proceeded at once to obtain a continuance of the case. The continuance was procured against the protest of the plaintiff. The case was then reset for trial on February 15, 1921, at which time judgment for two thousand five hundred dollars against John alone was given by the court, sitting without a jury; Frank and Samuel were held not liable.

Between the date of the withdrawal of Mr. Welch and the final trial of the case, being within a few weeks' time, the following matters occurred: Mr. McAllister, the substituted attorney, proceeded at once to draw papers for the dissolution of the partnership between John, on the one hand, and Samuel and Frank on the other, Samuel and Frank buying John's interest and retaining the business. Mr. McAllister also prepared a bill of sale for John to sign, conveying to Samuel and Frank his entire interest in everything appertaining to the grocery and bakery business; this bill of sale was duly executed. In fact, when all of the papers were finally executed, and before the trial finally took place, John was completely divested of all of his earthly possessions. The money which it is claimed was paid to John for his property was immediately sent to Europe, part to a brother as a gift and the remainder to the father for payment of alleged debts of the father. It happened that by the time judgment was filed in the case of *Cioli* v. *John Kenourgios*, John was "execution proof," as the sheriff's return showed.

The notice of intention to sell, filed in the recorder's office, fixed the time for sale at ten A. M., February 5, 1921, and place at Mr. McAllister's office; at the time and place above stated Mr. McAllister was not there, nor were any of the defendants there to receive notice of the claim of Mr. Cioli, the plaintiff, although the claim was duly presented. It appears from the record that the money had

been paid to John, and that he had sent it to Europe before the above date set for the payment.

It appears from an examination of the whole case that the plaintiff, when he brought his action, was ignorant of the fact that he did not have the slightest ground for a cause of action against the defendants, Samuel and Frank Kenourgios, but, as often happens in such cases, the plaintiff can only learn this at time of trial. Plaintiff must have known at the time the collision occurred that one of the brothers was driving, though he may not have known his first name, or he may have thought the one who was driving was doing so as the agent of the others; but whatever the reason which prompted the pleader at the time of bringing the action to name all three brothers defendants is now immaterial, for, although the plaintiff may have been under a misapprehension, it is certain that the defendants were not. This was clearly shown as soon as their answers were filed, from the advice given them by their attorney, Mr. Welch, advising only John to pay, and by the testimony of the defendants that the collision occurred while John was on a "joy ride." The defendants knew at the time they answered that the plaintiff was in error; they knew that it was John who was on the "joy ride," and not Frank or Samuel. They stated that Mr. Welch had been their attorney "for a long time"; they told both Mr. Welch and Mr. McAllister "all about the facts" of the case, and Mr. McAllister stated that Mr. Welch told him "about the facts" of the case. It is true they would not admit that the attorneys told them that Samuel and Frank could not be held liable, but every action of the attorneys appearing in the record, every step taken by the defendants, coupled with the evidence revealed by both attorneys and clients, leads irresistibly to the conclusion that the attorneys did advise them that no judgment could be obtained against Frank and Samuel. Every step taken by the defendants and their attorneys was consistent with such advice. Wherever the halting and evasive answers of the defendants failed to make complete connection the link is supplied by some positive act which speaks for them as clearly and certainly as words could declare it, and shows clearly what was in their minds.

These men had been associated very intimately for years as brothers and partners. Frank said "he had helped John and Sam out of trouble before." There is not a particle of evidence in the case that their relations were not of the most amicable nature, except from their own statement, and this not until after the accident with Cioli. The only evidence in the case, as stated, to support the claim that they wanted to get rid of John because they quarreled comes from their own lips; and notwithstanding their repeated assertions on the witness-stand that they could not get along with John, he has been their constant associate in the business, working with them at the very time of the trial, no change having taken place by reason of the sale and dissolution of the partnership, so far as anyone could see. All the circumstances appearing in the case refute their assertion that they were not willing or satisfied to retain John as a partner.

We find nothing in the evidence which would tend to convince the trial judge of the frankness and sincerity of any of the defendants, and we can easily imagine what their appearance must have been on the witness-stand from many of the questions and answers and remarks made during the course of the trial. In one portion of the testimony Frank was trying to make it appear that he did not understand that by putting all of the property out of John's hands would defeat recovery on Cioli's claim. The court was finally compelled to say, "Yes, you do, you understand English." All of the defendants, after considerable effort, finally admitted that they knew that if John had no property Cioli's judgment would remain unsatisfied, and John admitted he had nothing after he sent the money to Greece as gifts and to pay the pretended indebtedness of his father, and at the time he testified he stated that he was collecting his wages from his brothers every day, as fast as they became due. The whole scheme reveals a determined purpose to prevent recovery by Cioli for his injuries caused by John's reckless driving.

We can see nothing in the brothers going through the form of paying the $3,000 to John for the property. The very fact that it was sent to a father and a brother—beyond the process of the courts of this country, to persons hopelessly beyond the jurisdiction of our courts—is a badge of

fraud. And the testimony of Samuel and Frank, trying to declare their ignorance of what John did with the money until long after it was sent, could not be believed by anyone. Frank pretended that he did not correspond with his relatives in Greece, that John did the writing and he was not interested in the letters when they were received by John. He said, "Never received no letters from the old country; I received the letters and put them all aside; I never read one . . . I never wrote no letter and never read no letter." Further on in his testimony, in relation to these letters, he said, "Sometimes I read a letter and sometimes I didn't care to." The record is full of such evasive and contradictory testimony on many important matters.

Samuel pretended he did not know until July or August of 1921 that John sent the money away, and that he learned this from a letter written to John from the old country about that time. He finally admitted evasively that the receipts for the money sent were shown him several months before while on the witness-stand, to wit, during the month of April.

We do not deem it necessary to review the evidence further.

The grantor disposed of his entire property, and the grantees knew it. This was a badge of fraud. (Bump on Fraudulent Conveyances, p. 33, sec. 47, citing many authorities.)

The expectation and pendency of suit created a badge of fraud. (Bump on Fraudulent Conveyances, p. 36, sec. 50, citing numerous authorities.)

On the question of relationship, in matters of fraud, we quote from Bump on Fraudulent Conveyances, at page 56, section 67, as follows:

"Relationship is not a badge of fraud. Fraud, however, is generally accompanied with a secret trust, and hence the debtor must usually select a person in whom he can repose a secret confidence. The sentiments of affection commonly generate this confidence, and often prompt relatives to provide for each other at the expense of just creditors. Consequently relatives are the persons with whom a secret trust is likely to exist. The same principle applies to all persons with whom the debtor has confidential relations. Any rela-

tion which gives rise to confidence, though not a badge of fraud, strengthens the presumption that may arise from other circumstances, and serves to elucidate, explain, or give color to the transaction. This doctrine applies to the relationship of father, . . . brother, . . . '' (etc.) ''Wherever this confidential relation is shown to exist, the parties are held to a fuller and stricter proof of the consideration, and of the fairness of the transaction.''

[2] The fact that plaintiff called the alleged conspirators to the witness-stand did not compel approval by him of their testimony. He could use their appearance on the stand, their words, their acts—in fact anything they could furnish in his favor, and reject the rest. The salutary provision of section 2055 of the Code of Civil Procedure was designed to prevent as far as possible parties to an action from perpetrating fraud and dishonesty. It strips them of former barriers used for shielding falsehood.

[3] As soon as the automobile collision occurred Cioli had a claim against John Kenourgios, and as soon as his brothers, Frank and Samuel, had notice of the claim, they were no longer innocent third parties without notice.

The greater weight of authority placed Cioli in the category of creditor as soon as the collision occurred, but if there is doubt in our own state that this is the proper designation of Cioli's status, certainly, no matter what his status may be termed, his rights are fully protected under section 3439 of our Civil Code, and he cannot be deprived of his rights by a fraudulent conveyance.

[4] Appellants strenuously urge that the fact that an adequate consideration was paid removes the taint of fraud from the transaction. This fact in some cases would be a controlling factor, but we are unable to attach any importance to this fact in this case. In the light of the circumstances of this case, it appears but hollow form merely. The explanation as to where the ready money came from and why John was not bought out long before was not satisfactory, and the payment and sending away of the money seems, to say the least, to have been a little overdone, for ''when a part is over-acted the delusion is broken and the fiction appears.'' (Bump on Fraudulent Conveyances, p. 54, sec. 64.)

In *Hunters* v. *Waite*, 3 Gratt. 32, 14 Am. St. Rep. 747 (note), Baldwin, J., states: "It is not the consideration, but the intent with which a conveyance is made, that makes it good or bad as against creditors. However valuable the consideration, if the conveyance be designed to delay, hinder, or defeat creditors, it is void." For further consideration of the subject, see *Fluegel* v. *Henschel*, 7 N. D. 276 [66 Am. St. Rep. 642, and note, 74 N. W. 996]; *State* v. *Mason*, 112 Mo. 374 [34 Am. St. Rep. 390, and note, 20 S. W. 629].

We will not undertake to even touch upon the vast number of authorities bearing upon the question of the proof of fraud, and believe it will suffice to merely quote the following from the work of Mr. Justice Cooley on the subject of Torts, at page 907, volume 2, third edition: "Fraud is never presumed, and the party alleging and relying upon it must prove it. This, however, is one of these rules of law which is to be applied with caution and circumspection. 'So far as it goes, it is based on a principle which has no more application to frauds than any other subject of judicial inquiry. It amounts but to this, that a contract, honest and lawful on its face, must be treated as such until it is shown to be otherwise by evidence of some kind, either positive or circumstantial.' Fraud is therefore as properly made out by marshaling the circumstances surrounding the transaction, and deducting therefrom the fraudulent purpose, when it manifestly appears, as by presenting the more positive and direct testimony of actual purpose to deceive; and, indeed, *circumstantial proof in most cases can alone bring the fraud to light, for fraud is peculiarly a wrong of secrecy and circumvention, and is to be traced not in the open proclamation of the wrongdoer's purpose, but by the indications of covered tracks and studious concealments.* And while it is often said that to justify the imputation of fraud, the facts must be such as are not explicable on any other hypothesis, yet this can mean no more than this, that the court or jury should be cautious in deducing the fraudulent purpose; *for whatever satisfies the mind and conscience that fraud has been practiced is sufficient.*" (Italics ours.)

We do not deem it necessary to discuss the objections made in defendants' closing brief in relation to the pleadings and findings. No one was or could have been misled

by them. It appears the case was fairly tried and a just judgment rendered therein, which should not be disturbed. The judgment is therefore affirmed.

Finch, P. J., and Burnett, J., concurred.