[Civ. No. 9624. First Appellate District, Division Two.—January 31, 1935.]

JERRY J. VOGEL, Respondent, v. EDNA M. SHERIDAN et al., Appellants.

Hudson & Martin, Geo. Allan Smith and J. A. Bardin for Appellants.

Mott, Vallee & Grant, Wyckoff, Gardner & Parker, Hubert C. Wyckoff and Paul Vallee for Respondent.

SPENCE, J.—Plaintiff, a judgment creditor of the defendants John F. Sheridan and John Franklin Music Company, a corporation, brought this action seeking a decree declaring void as against the plaintiff herein, certain transfers made by said judgment debtors to defendant Edna M. Sheridan. Plaintiff had judgment as prayed, and from said judgment defendants appeal.

The parties to this controversy have submitted voluminous briefs covering the story of the financial affairs of the defendants. This story is an interesting one not only because of the fact that the defendants rose practically from poverty to affluence through the promotion and sale of a single song entitled "Marcheta", but also because of the manner in which their financial affairs were handled. The briefs are filled with figures, including computations and recapitulations, but in setting forth the facts for the purposes of this discussion, it appears that we may eliminate much of the detail and may deal only with approximate amounts.

The attack upon the judgment is based upon the alleged insufficiency of the evidence. We shall therefore set forth some of the evidence upon which the trial court based its findings to the effect that the transfers made to Edna M. Sheridan by the judgment debtors were made with the intent to delay and defraud creditors.

Defendant John Franklin Sheridan was an actor. He stated that he was known as Frank Sheridan "theatrically and legally". As far back as 1909, a judgment of $3,000 was obtained against him in California based upon an unsatisfied judgment previously obtained against him in Utah. This judgment had never been paid up to the time of the trial herein, and because of his absence from the state of California, the statute of limitations did not begin to run thereon until his return here in 1925. In the meantime, Mr. Sheridan had spent most of his time in New York City. While continuing his work as an actor, he entered the music business under the fictitious name of John Franklin Music Company. It will be noted that this fictitious name bore no apparent relation to the name Frank Sheridan under which Mr. Sheridan was commonly known. In 1916, he married Mrs. Sheridan. The business was not prospering in 1917 and 1918, and Mr. Sheridan was heavily indebted. He admitted in certain testimony given in New York, that in 1917 he was "very, very broke". In order to continue in business and to protect his printer Lawson, to whom he was indebted, he incorporated the business in March, 1918, under the same fictitious name. The authorized capital stock of the corporation was $5,000 divided into 100 shares of $50 each. Of these, 98 shares were issued to Lawson as security for his debt. Mrs. Sheridan testified that prior to incorporation, she loaned $3,000 to Mr. Sheridan for use in the business. When asked if this money was loaned or given to him by Mrs. Sheridan, Mr. Sheridan replied, "Loan, or give, she was my wife". He did not know whether this amount was carried over as a charge against the corporation. He said, "I simply had it here (indicating head)".

Sheridan had previously purchased the song "Marcheta" from its composer for the sum of $50, but there had been practically no sales made. In the latter part of 1920 or the early part of 1921, plaintiff, who believed this piece had great possibilities, made an agreement with Mr. Sheridan whereby plaintiff agreed to "plug" this song. The word "plug" was used to mean to boost, advertise and promote the song. It was agreed that plaintiff should have a "25% interest" and that after deducting five cents per copy for printing and overhead, Mr. Sheridan was to receive three-fourths and plaintiff one-fourth of the balance. Plaintiff

performed the services and after about a year's work the song became exceedingly popular not only in the United States but in other countries. Sales were tremendous and the music company launched into an era of prosperity which lasted until 1925. In the meantime, some money had been paid to plaintiff, but in 1925 a dispute arose between plaintiff and Mr. Sheridan. This dispute resulted in an action brought by plaintiff in New York against Mr. Sheridan and the corporation upon the above-mentioned agreement in which action plaintiff obtained a judgment in 1928 for approximately $25,000. In September, 1925, the Sheridans had moved to California and had remained here. After obtaining the New York judgment, plaintiff brought an action in California based upon the New York judgment and obtained a judgment against Mr. Sheridan and the corporation in a similar amount. Execution was returned wholly unsatisfied and thereafter plaintiff commenced this action.

We now come to a consideration of the transactions and dealings between the Sheridans and the corporation which were claimed by plaintiff to include transfers to Mrs. Sheridan with intent to delay and defraud creditors of Mr. Sheridan and the corporation. Preliminarily we may state that the corporation itself does not appear to have been taken seriously by the Sheridans. In fact, the testimony showed that Mr. Sheridan had referred to it as a "joke corporation". In 1923, Lawson, the printer, had been fully paid and all of the stock of the corporation was issued by Mr. Sheridan to himself. Almost immediately thereafter, he issued half of the stock to Mrs. Sheridan, and in 1924, he issued the remaining half to Mrs. Sheridan, as trustee for their son. It is conceded that the transfer of the stock to Mrs. Sheridan as trustee was ineffective, but it does not appear that any change was made on the stock books of the corporation. While Mrs. Sheridan was designated as the president and Mr. Sheridan was designated as the secretary of the corporation, no directors' meeting was ever held. Counsel for appellants admits that Mrs. Sheridan was merely a figurehead so far as the management of the corporation was concerned and that Mr. Sheridan ran the business in substantially the same manner as before the incorporation. Prior to the time that the corporation began to

make a profit, he deposited his salary checks from other sources in the corporation account. During all of the time, he withdrew moneys from the corporation account for business purposes and also for every purpose for which a personal account might be used. As the income of the corporation grew, large sums of money were withdrawn from the corporation but no dividends were ever declared by the corporation. Despite the fact that large sums of money went through the corporation's account, we find no time at which the balance therein was permitted to reach the sum of $10,000. Whenever the balance amounted to a few thousand dollars, a check for a substantial sum was drawn thereon to Mrs. Sheridan or to Mr. Sheridan and indorsed by him to Mrs. Sheridan or was drawn to some firm on account of purchases of real estate or stock which was placed in the name of Mrs. Sheridan. After the dispute with plaintiff in 1925 and when the Sheridans came to California in that year, all of the money in the corporation account was withdrawn and was brought to California. Thereafter, the music business was continued in New York through a representative but the money received from sales was forwarded to California. In 1927, the remaining assets of the corporation were sold for an agreed price of $21,000, of which $10,000 was paid in cash. The proceeds of the sale were likewise brought to California. Practically all of the withdrawals mentioned above together with the proceeds of the sale found their way either directly or indirectly into the bank accounts or investments in the name of Mrs. Sheridan. The result was that there was no property standing in the name of Mr. Sheridan or the corporation out of which plaintiff's judgment against said judgment debtors could be satisfied. Summarizing the amounts received by Mrs. Sheridan from the judgment debtors and either deposited in banks in her name or invested in real estate or stock in her name, we arrive at a total of approximately $180,000.

The real property subjected to the decree in this action consisted of numerous parcels of real estate in the county of Monterey standing in the name of Mrs. Sheridan. The total purchase price paid for said parcels exceeded $34,000, all of which money came from the sources above mentioned. A portion of this real estate was purchased from the Del Monte Properties Company during the years 1923 to 1926,

inclusive, for the sum of approximately $22,500. The remainder was purchased from the Monterey Building Corporation during the years 1925 to 1927, inclusive, for the sum of approximately $11,700. With respect to the purchases of the parcels from the Del Monte Properties Company, it is significant to note that the correspondence with respect to the same was written on the stationery of the music company by Mr. Sheridan; that while he requested that the deeds and contracts be made out in the name of Mrs. Sheridan, he always referred to the purchases as his own, and dealt with the property as his own; and that approximately half of the purchase price for said parcels was paid directly by checks drawn by Mr. Sheridan on the account of the music company. Some but not all of these checks bore notations such as ''Loan repayment on loans E. M. S.'', the initials being those of Mrs. Sheridan, but it is also significant to note that the amount of these checks purporting to be drawn in repayment of loans exceeded the sum of $30,000. Mrs. Sheridan admitted that she loaned only $3,000 to the company, and while Mr. Sheridan endeavored to show that her advances amounted to approximately $7,000, it is apparent that the checks purporting to repay the alleged loans amounted to many times the amount of said loans. It may be further stated that Mrs. Sheridan showed but little knowledge of these purchases when examined as a witness. It does not appear that she had ever seen the parcels before the purchases were made. She did not know how much had been paid for any of them and did not know whether the lots were purchased on contract or by mortgage. In her testimony on the trial, she referred on one occasion to ''purchasing for us''. In her deposition, she made several corrections, crossing out the word ''he'', referring to Mr. Sheridan, and inserting the word ''I'', referring to herself.

We shall not pause to enumerate the many inconsistencies in the testimony of Mr. and Mrs. Sheridan. Counsel for appellants endeavors to explain these by the lapse of time between the occurrences and the trial, but the trial court was not bound to give full faith to this explanation. It was proper for the trial court to give due consideration to these inconsistencies in determining the weight to be given to the testimony.

■ In our opinion there was ample evidence to sustain the findings that the transfers to Mrs. Sheridan were made by the judgment debtors with the intent to delay and defraud creditors. The record presents the picture of a man who never had his obligations fully paid at any time. The California judgment obtained against Mr. Sheridan in 1909 remained unsatisfied at all times up to the trial of this action. He was otherwise heavily indebted and "broke" during the early years of the music company. Thereafter he incurred heavy obligations, including his obligation to plaintiff. He started the music company under a name which did not disclose the identity of its owner and he continued the business under that name after incorporating for the purpose of protecting one of his creditors. There was practically no time after the incorporation of that business in which he permitted any of the stock to remain of record in his name. The corporation was merely a matter of convenience and was only a corporation in form. Mr. Sheridan handled the business entirely as his own, but designated Mrs. Sheridan as president and relegated himself to the less conspicuous position of secretary. No directors' meetings were held and no dividends were declared, yet we find Mr. Sheridan continually transferring the assets into the name of Mrs. Sheridan. It was these assets which were used for the purchase of the property involved in this litigation. From the detailed account of the handling of the affairs of Mr. Sheridan and of the corporation as it appears in the record, the trial court could very properly conclude that all of the transfers of these assets to Mrs. Sheridan were voluntary transfers made with the fixed intent and purpose of delaying and defrauding creditors and that Mrs. Sheridan accepted these transfers with full knowledge of such intent and purpose. We therefore conclude that there was ample evidence to support a judgment under the provisions of section 3439 of the Civil Code.

■ Appellants contend that findings are deprived of support because the corporation was solvent in 1923, 1924 and 1925 when the transfers with which certain property was purchased were made to Mrs. Sheridan. In this connection, it may be stated that the corporate books were not all before the court and it is not possible to ascertain definitely whether the corporation was solvent or insolvent

at the time said transfers were made. This action, however, may be sustained under section 3439 of the Civil Code regardless of the question of solvency as the evidence was sufficient to show an actual intent to delay and defraud creditors. Such intent invalidates the transaction as against creditors even though the debtor is not entirely stripped of assets and may still have sufficient property after such transfers to satisfy his creditors. (*Title Insurance etc. Co.* v. *California Dev. Co.*, 171 Cal. 173 [152 Pac. 542]; *First National Bank of L. A.* v. *Maxwell*, 123 Cal. 360 [55 Pac. 980, 69 Am. St. Rep. 64]; *Alpha H. & S. Co.* v. *Ruby Mines Co.*, 97 Cal. App. 508 [275 Pac. 984]; *Benson* v. *Harriman*, 55 Cal. App. 483 [204 Pac. 255]; *Johns* v. *Baender*, 40 Cal. App. 790 [182 Pac. 55]; *Bekins* v. *Dieterle*, 5 Cal. App. 690 [91 Pac. 173]; 12 Cal. Jur., pp. 976, 977.) ▮ It is only in actions maintained under the proviso in section 3442 that the insolvency of the transferor becomes of controlling importance and in such actions, the question of actual intent becomes immaterial. The distinction is pointed out in *Hanscome-James-Winship* v. *Ainger*, 71 Cal. App. 735 [236 Pac. 325], and *Allee* v. *Shay*, 92 Cal. App. 749 [268 Pac. 962]. It has been stated that both sections should be liberally construed to effect their purpose which "undoubtedly is to prevent debtors from placing property which legitimately should be available for the satisfaction of demands of creditors beyond their reach". (*Borgfeldt* v. *Curry*, 25 Cal. App. 624, 626 [144 Pac. 976].) It is hardly necessary to resort to a liberal construction of said section 3439 to bring the facts of the present case within its terms.

The judgment is affirmed.

Nourse, P. J., and Sturtevant, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on March 2, 1935, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 1, 1935.