[Civ. No. 13659.  First Dist., Div. One.  Nov. 18, 1948.]

HELEN PETERSON, Respondent, v. JOHN EDWARD WILSON et al., Appellants.

Russell T. Ainsworth, in pro. per., Geo. Hewlett and Geo. K. Ford for Appellants.

Fred A. Watkins for Respondent.

BRAY, J.—There are two appeals, both from the judgment and decree in favor of plaintiff Helen Peterson, in a

quiet-title action. One appeal is by defendants and cross-complainants John Edward Wilson and Constance Patricia Wilson; the other is by defendant and cross-complainant Russell T. Ainsworth.

The complaint is in three counts. The first count is in the usual form of a quiet-title action against all defendants. The second and third counts are against defendants Ainsworth and McNally respectively, for alleged abuse of process in causing executions to be issued and levied, and sales to be made of John Wilson's interest in the property involved, when, it is claimed, said defendants knew it belonged to plaintiff and that Wilson had no interest therein. Defendant McNally filed a disclaimer, so it is necessary to consider only the first two causes of action.

John and Constance Wilson filed an answer and a cross-complaint against plaintiff, in which they alleged that John Wilson was the owner of the equitable title to the property; that a confidential relationship existed between John and his sister, the plaintiff, until March 31, 1945, on which date plaintiff breached an agreement made between them on March 15, 1944, under which John caused the legal title to be conveyed to her, and she agreed to hold it for him, in trust, and to account for the proceeds therefrom. The Wilsons asked that the court declare that the title to the property is held by plaintiff in trust for John.

Defendant Ainsworth filed an answer and a cross-complaint against plaintiff, defendant John Wilson, and also brought in the defendants Gridley. The cross-complaint alleged in effect that when plaintiff acquired the legal title, John Wilson was the beneficial owner; that the conveyance to her was made in anticipation of an adverse judgment in favor of Ainsworth and against John in an action then pending between the two, and at a time when John was insolvent; that the conveyance was made without consideration and with the intent to hinder, delay and defraud Ainsworth as a creditor. The sale under execution is then set forth and it is claimed that Ainsworth is the owner of the property, subject only to John's right to redeem. The second count of the cross-complaint sets up that the conveyance to plaintiff was made in trust for John. The defendants Gridley are joined because they are alleged to be in possession of the property under an agreement of sale with plaintiff, made with full knowledge of Ainsworth's rights. (At the trial it was stipulated that the Gridleys had full knowledge of a prior action by Ainsworth to

quiet title and the controversy over the property before entering into the agreement of purchase with plaintiff.)

Ainsworth contends (1) that the evidence does not support the court's findings; (2) that the admissions in the pleadings created a prima facie case of fraud and that plaintiff did not meet the burden thus raised; (3) that the court failed to find on certain important issues.

The Wilsons make but one contention—that the court prejudicially erred in refusing to admit certain documents in evidence.

### FINDINGS OF THE COURT

The findings important here follow: Plaintiff for a long time prior to the commencement of the action was and still is the owner and entitled to the possession of the property, and none of the defendants (other than the Gridleys, who claim through plaintiff, and will be disregarded hereafter), have any interest therein. Ainsworth, well knowing of plaintiff's ownership of the property and of John Wilson's lack of interest therein, abused the process of the court in obtaining a sale under execution of the alleged right of John therein. It found that it was not true that on March 15, 1944, at the time of the conveyance of the property to plaintiff[1] Wilson was the owner of the property. On March 15, 1944, defendants John and Evelyn Wilson[2] directed and caused the California Pacific Title Insurance Company (hereinafter referred to as the title company) as holder of the legal title, to convey it to plaintiff. This conveyance was not made in anticipation of an adverse judgment against Wilson in the Ainsworth suit nor to hinder, delay or defraud Ainsworth. Originally the legal title stood in the name of Evelyn Wilson, and was by her conveyed to the title company pursuant to a holding agreement. Thereafter John and Evelyn were in default in excess of $11,000 upon a note to the San Francisco Bank, secured by a deed of trust on the property. In February, 1944, the bank filed a proceeding in court for specific performance under the deed of trust, and procured the appointment of a receiver, who took possession of the property, collecting the rents, and ousted John and Evelyn from possession; that by reason "of

[1] The conveyance in question was made to plaintiff and her husband in joint tenancy. The husband died prior to the commencement of this action and the title vested in plaintiff as survivor. For brevity, we have treated this conveyance as though made to plaintiff alone.

[2] John's former wife, who was made a defendant in plaintiff's complaint. The action was dismissed as to her.

said indebtedness and default and the dissipation of any equity" either of them may have had in the property, John "renounced" to the bank any claim in it; that the bank arranged to dismiss the proceedings and to release both from any liability under the note and deed of trust, in consideration of John and Evelyn authorizing and directing the title company to deed the legal title to the bank, or its nominee; that in pursuance thereof and of the promise of plaintiff to pay the bank $10,000 from the sale of certain property and to assume and agree to pay the Wilson note and deed of trust, the title company, on March 15, 1944, deeded the title to plaintiff, who agreed in writing to assume and pay the said note and deed of trust. In August, 1944, plaintiff paid the bank the $10,000 cash from the sale of certain property belonging to her. The court also found that John and plaintiff are brother and sister, and that a relationship of trust and confidence existed between them, but that it is not true that they agreed that plaintiff was to hold the property in trust for him and that no trust agreement existed between them.

### AINSWORTH APPEAL

The transcript is lengthy—approximately 800 pages. Ainsworth claims that plaintiff, the principal witness for her side, was evasive, contradictory, and not worthy of belief. Plaintiff, on the other hand, makes the same claim about her brother John, who was the chief witness for Ainsworth. John apparently was not too credible a witness. He even denied that he was in default to the bank, when the evidence plainly shows the contrary. As the court evidently believed plaintiff's version, our duty is to determine whether there is substantial evidence to support the court's findings, and whether, as contended by Ainsworth, the documentary evidence is so conclusive and clear as to admit of no explanation contrary to the interpretation he places upon it.

Taking the testimony in favor of plaintiff and the reasonable inferences therefrom, which we are required to do, it shows the following situation. A brief résumé of the background of the case is that John and his sister, the plaintiff, enjoyed a confidential relationship until the time of this controversy. John drank considerably and spent his money freely. John was the promoter type, always working on big deals, who said he was not content to work steadily or on a $200 a month salary. In 1940, John was broke. The brothers and sisters (there were eight children in the Wilson family) living in

this area always had helped one another. Plaintiff had helped all of them and for 18 years had given money to John, trying to help him make something of himself. Plaintiff managed apartment houses for a living. Her husband was an invalid for 18 years and could do nothing in the way of business transactions. In 1940, she answered an advertisement for a position and was employed as manager of an apartment house on Jefferson Street. Shortly thereafter the owner wanted to dispose of the property. Plaintiff purchased it by assuming a first mortgage for $47,000 held by the San Francisco Bank and giving the owner a second mortgage for $8,000. The transaction was handled by Mr. Meyer of the bank. John had no interest in this property. Plaintiff gave John one of the apartments to live in. He brought his own furniture for use in this apartment alone. He did not know Meyer prior to plaintiff's purchase of this property. Through Meyer, John in 1940 acquired three apartment houses by assuming the indebtednesses thereon. In February, 1941, in the same manner, the three apartment buildings in dispute here were acquired. Title to all six was taken in the name of John's wife, Evelyn, "as her sole property," according to John's testimony. To acquire the property in question here, the Wilsons gave the San Francisco Bank their joint and several note for $186,000, secured by a blanket deed of trust on the three properties. Although John testified that about July, 1943, he sold the first three apartment buildings at a profit of $40,000, and that the income from the other three properties was $1,000 per month, the Wilsons, in February, 1944, were in default to the bank on the loan on these properties. Title to the properties was conveyed to the title company, pursuant to a holding agreement entered into on February 28, 1942, between the title company and Evelyn, in which it was agreed that the title was being held for Evelyn, to be conveyed by the title company to whomsoever Evelyn might direct in writing. In addition to the properties involved in this action, it included two of the three properties which John claims were sold in 1943 at a $40,000 profit. There was a provision in the agreement to the effect that on payment to the title company for Evelyn's account of $2,500 for each parcel, the title company could convey any parcel "to the order of John E. Wilson without the approval of Evelyn H. Wilson." On February 9, 1944, Evelyn wrote the title company amending

this provision by changing the amount to $1,250 as to two of the three parcels which are involved in this action.

■ In July of 1943, Evelyn and John were divorced and a property settlement agreement entered into by them which was filed with the title company before the conveyance to plaintiff was made. On March 13, 1944, both Evelyn and John signed an authorization to the title company to transfer the title to plaintiff. The effect of this transfer is the most important question in the case. John and Ainsworth contend it was in trust for John, and in any event, that there was no consideration for the transfer. Plaintiff contends, and the court found, that it was in consideration of plaintiff's assuming the indebtedness against the property and at the bank's insistence. Meyer testified that at the time the bank brought suit on the $186,000 note and deed of trust there were delinquent installments in the sum of over $11,000 and over $1,900 in taxes which the bank had had to pay; that on February 7, 1944, John called to see Meyer and stated that he was sick and tired of handling the properties and was going to abandon them, and might go to Hawaii for a job. Notice of default was recorded and the suit was filed February 14, and a receiver placed in possession of the properties. John then stated to his sister: "Why don't you go down [to Meyer at the bank] and make a deal for this? You might as well have it as the wolves on Montgomery Street." On March 17, agreements were entered into between the bank and plaintiff wherein the bank agreed to have the property transferred to plaintiff upon condition that she assume and agree to pay the obligations against the property, and that out of the sale price of her Jefferson Street property if, as, and when sold, she would pay the bank $10,000 in reduction of the principal of the $186,000, to all of which she agreed. The bank required these agreements as a condition to removing the receiver, dismissing the suit, and consenting to the transfer of the title. The bank's attorneys prepared an authorization to the title company, to be signed by the Wilsons, instructing it to transfer the title to plaintiff. John told plaintiff where she could find Evelyn, from whom he was then separated. Plaintiff took the authorization to Evelyn, who required plaintiff to give her a promissory note payable to her for $1,500 before she would sign. Plaintiff executed such a note and Evelyn then signed the authorization. John signed it in the office of the bank's attorneys.

It is not necessary to detail more of the evidence here. While there is a sharp conflict in the testimony of John, as opposed to that of plaintiff, and while there is some contradiction and confusion in plaintiff's own testimony, nevertheless a study of the transcript shows that there is substantial evidence to show that whatever John's interest in the properties may have been, the bank was about to take it over. A notice of default had been recorded, and in order not to have to wait the three months necessary until the properties could be sold under foreclosure, and possession obtained, the bank brought a suit for specific performance under which a receiver took possession and collected the rents. Evelyn, for a consideration of $1,500, was willing to, and did, release her interest in the properties. John was through with the properties and was willing to, and did, release his interest in them. Plaintiff took title from the record owner on her assumption of all the indebtedness against the properties. The evidence amply justifies the finding that there was no trust relationship between her and John, and that after John signed the authorization to the title company and it conveyed the title to plaintiff, John had no further interest in the property, if he had any at that time.

The court found that at no time did John have any interest in the properties, even during the period of the holding agreement and prior thereto, when the title was in his wife, Evelyn. This finding is bitterly attacked. It is contended, too, that the court prejudically erred in refusing to admit into evidence on this question the property settlement agreement, which it is contended expressly modified the holding agreement by providing that the title company should thereafter hold the title for John rather than Evelyn. This question becomes of no importance as to John, for, as pointed out before, John authorized the conveyance to plaintiff, and thereby lost any interest in the property which he might have had.

However, as to Ainsworth, the question is important. If John at that time had an interest in the property and was insolvent (and the evidence clearly shows that he was), then the conveyance to plaintiff would have been in fraud of Ainsworth, as a creditor of John, if there was no consideration moving to John for it. John, as far as he himself was concerned, could give the property to plaintiff, or abandon it to plaintiff, by his authorization to the title company to convey it to her, and the transaction would be valid without any con-

sideration; but as far as his creditors are concerned, the conveyance would be in fraud of their rights unless there was consideration and no intent to defraud creditors.

This brings us to the question, assuming that John at the time had an interest in the property: did the assumption by plaintiff of the indebtedness on the property constitute consideration in law? Ainsworth takes the position that because the bank did not expressly agree to release John of his liability on the note and deed of trust, the assumption of the debt by plaintiff did not constitute consideration. Much point, too, is made of the fact that the deed from the title company to plaintiff is dated March 15, 1944, while the assumption of the indebtedness by plaintiff and agreement to pay the $10,000 are dated March 17. However, Meyer testified that the understanding that these be given was had before the date of the deed and were a condition of the transfer of title to plaintiff, and the court so found.

Upon the execution of these agreements the bank had the receiver discharged, the suit dismissed, and proceeded no further with the foreclosure under the deed of trust. There is no evidence in the record that the bank made any agreement with John to forebear in the action then pending or to relieve him from any liability to the bank, although the court found that the bank agreed to release John and his wife therefrom.

As said in *Mix* v. *Yoakum,* 138 Cal.App. 290, 294 [31 P.2d 1071]: "A conveyance, in consideration of the assumption of a mortgage on the property, is based on a valid consideration. There is authority for the proposition that where the property conveyed is of value in excess of the mortgage, an agreement on the part of the grantee to pay the same is not a valuable consideration as against the grantor's creditors. It has been held in this state that the disparity between the value of the property and the encumbrance must be such as to show gross inadequacy of consideration. (*Hasenjeager* v. *Voth,* 91 Cal.App. 398 [267 P. 146].) Fraud is never presumed, and the burden is on the creditor who seeks to avoid the transfer to both allege and prove inadequacy of the consideration. Conversely, the grantee is not required to either allege or prove the adequacy of the consideration. The views here expressed find support in the further cases of *Manning* v. *App Con. Gold Min. Co.,* 171 Cal 610 [154 P. 301]; *Saunderson* v. *Broadwell,* 82 Cal. 133 [23 P. 36]; *Gladwin* v. *Gladwin,* 13 Cal. 332; *Greenwalt* v. *Mueller,* 126

Cal. 639 [59 P. 137]; *Carty* v. *Connolly,* 91 Cal. 15 [27 P. 599]."

The Ainsworth cross-complaint alleges that at the time of the conveyance to plaintiff, the properties were a valuable asset. This is not denied. However, there was no proof, or attempted proof, of disparity between the value of the properties and the encumbrance. ■ The burden of proof in showing disparity is on the creditor. (*Hasenjeager* v. *Voth,* 91 Cal.App. 398 [267 P. 146].) Ainsworth attempts to distinguish our case from the principle of the Mix case, by claiming that here there was no agreement by the grantee to assume and pay the debt of the grantor, that the grantee, plaintiff, merely took the property subject to the deed of trust. He thereby, however, overlooks the document "Plaintiff's Exhibit 10" which, while a guarantee in form, under the circumstances constitutes an agreement to pay. Moreover, it was held in *Everts* v. *Matteson,* 21 Cal.2d 437, at page 447 [132 P.2d 476] : ". . . it is well established both in California and elsewhere, that a grantee of real property subject to a mortgage or trust deed who agrees to pay such indebtedness, becomes, as to the mortgagor or trustor, the principal debtor of the mortgagee or beneficiary and the mortgagor or trustor occupies the relation of surety." There is also plaintiff's Exhibit 9, which is a promise to reduce the principal by the payment of $10,000 out of the sale price of other property, if and when sold. Thus, assuming John to have been the beneficial owner of the property, there was adequate consideration for the conveyance from him, through the title company, to plaintiff.

■ While there is evidence which would have supported a contrary finding, had the court so held, there is substantial evidence to support the court's finding that the conveyance was not made with the intent to hinder, delay or defraud the creditor Ainsworth, even though the evidence shows that plaintiff knew of the pending suit, and hence cases cited by Ainsworth such as *Cioli* v. *Kenourgios,* 59 Cal.App. 690 [211 P. 838], and *Vogel* v. *Sheridan,* 4 Cal.App.2d 298 [40 P.2d 946], which hold that even though there be consideration a conveyance made with the intent to delay, hinder or defeat creditors, is void, are not in point. Nor are cases such as *Wight* v. *Rohlffs,* 48 Cal.App.2d 696 [121 P.2d 76], and *Frankish* v. *Federal Mortgage Co.,* 30 Cal.App.2d 700 [87 P.2d 90], which hold that where there is no consideration for

the conveyance or there is an intent to hinder creditors, the burden shifts.

Under the holding agreement, John had an interest at least to the extent that he could direct the title company to convey to whomsoever he desired, "without the approval of Evelyn," upon the payment of $2,500 for her account (later reduced to $1,250). Under the property settlement agreement, which the court permitted in evidence for the limited purpose of showing knowledge of it by the title company, the holding agreement was amended to provide that the title company should hold the title in trust no longer for Evelyn, but for John. The Ainsworth cross-complaint alleged that on or about the 15th of March, 1944, and at the time of the conveyance to plaintiff by the title company, John was the owner of the property, and that the legal title was held by the title company for the sole benefit of John. In her answer to this cross-complaint, plaintiff did not deny these allegations, although she did allege that at all times mentioned in the cross-complaint, and for a long time prior thereto, she was the owner. However, in spite of this admission by failure to deny, the parties considered the question in issue as though it were denied. (*Schroeder* v. *Pissis,* 128 Cal. 209, 212 [60 P. 758].) It appears from the holding agreement and the property settlement agreement that John did have an interest in the property. As the title company's right to convey depended upon the holding agreement, and as the holding agreement was modified by the property settlement agreement, which was filed with the title company, plaintiff was put on notice as to John's interest in the property. Actually, the letter to the title company, which is the title company's authority to make the transfer to plaintiff, refers to the property settlement agreement. Hence, plaintiff cannot question it. John authorized the conveyance to plaintiff, so that as to him the erroneous finding by the court that he had no interest in the property is unimportant. Also as to Ainsworth it does not change the situation, for throughout this opinion we have treated the case as though the court had found that John was the beneficial owner at the time of the conveyance to plaintiff.

Defendants complain of the failure of the court to find in the language of the cross-complaint that plaintiff accepted the conveyance with knowledge that John directed it to be made to her in pursuance of a fraudulent scheme to delay and defraud Ainsworth and by such conveyance

John became insolvent. While the court did not use these exact words, it did find that the conveyance was not made in anticipation of a judgment in favor of Ainsworth or to hinder, defraud or delay him as a creditor, nor was it made on any secret trust for John. While the court probably should have made the additional finding that John was insolvent, the failure to do so is unimportant. Insolvency alone does not establish fraud. (*Hasenjeager* v. *Voth, supra,* p. 396.) Had such a finding been made it would not change the legal situation, for the evidence supports the court's conclusion that there was no intent to defraud and that there was a valid consideration for the conveyance.

Subsequent to the conveyance, there were a number of financial dealings between plaintiff and John in which she paid bills for him, and gave him sums of money, amounting in all to over $10,000. There was also defendant Ainsworth's Exhibit X in which plaintiff told John that he had taken money ''in excess'' and he would be allowed $50 per month ''from now on'' and in which she said: ''*When* and if, these Bldgs. are sold your attorney can represent you and any adjustment will be taken care of. *I* assure you I'll not run and see him or be-little you in any way.'' Had the court found that there was a secret trust between plaintiff and John, these matters would have supported such a finding. On the other hand, plaintiff explained that she was doing as she had done for many years, merely helping out an impecunious brother; that the statements above quoted in Exhibit X were simply a continuation of the financial aid she was giving her brother to keep him from going into bankruptcy and because he had recently been married and had a baby. Moreover, he was constantly threatening her with court action, bullying her and the tenants. The trial court saw the witnesses and believed her explanation. We cannot say as a matter of law that the court was wrong.

█ Ainsworth complains of the finding that he abused the process of the court, because he claims there was no showing of malice. In spite of the fact that Ainsworth had sued John for slander, the evidence shows that John went to Ainsworth to complain about his sister's actions, and there is ample support for the court's finding that Ainsworth knew at the time of the execution sale that John no longer had any interest in the property. That is sufficient to support the court's finding. A finding of malice is not required.

WILSON APPEAL

As pointed out heretofore, the court should have admitted into evidence for all purposes the property settlement agreement, which constituted a modification of the holding agreement, thereby providing that the title company held the property in trust for John. However, the failure to do so was error without prejudice, for the reason, also as heretofore set out, that John authorized the conveyance to plaintiff, for a consideration and not in trust. It is obvious from the testimony that while the bank did not expressly agree with John to relieve him from the suit and the indebtedness, they were accepting plaintiff's assumption of the debt, and, so far as they were concerned, John was to be disregarded.

WAS THE DEED OF TRUST A PURCHASE MONEY ONE?

In an endeavor to escape the effect of the cases which hold that the assumption of the indebtedness secured by a deed of trust constitutes consideration, Ainsworth contends that the deed of trust here was a purchase money one within the meaning of section 580 (b) of the Code of Civil Procedure. If it were such, no deficiency judgment would lie after sale of the property covered by it and no personal judgment could be obtained against Wilson. Hence, it is contended, the assumption of such an indebtedness could not constitute consideration as against Wilson's creditors. No authority is cited which considers the question of the effect on consideration of the assumption of a purchase money deed of trust. However, it is not necessary for us to consider this question, as the deed of trust here was not a purchase money one. The property was acquired from the Realty Exchange Corporation in whose name the title stood, subject to a "good sized" deed of trust to the bank, and a second mortgage for $4,800, to whom, the record does not disclose. In order to obtain the property, the Wilsons executed a new deed of trust to the bank in the sum of $186,000, and the other deed of trust and mortgage were released. Thus the bank did not own the property when it was conveyed to the Wilsons, although, apparently, the bank was able to get the then owner to transfer the title for the amount of the indebtedness against the property. A case directly in point on this subject is *Ladd & Tilton Bank* v. *Mitchell,* 93 Ore. 668 [184 P. 282, 6 A.L.R. 1420]. In Oregon there was a statute (Lord's Oregon Laws, § 426) which provided that there could be no deficiency judgment on a mortgage "given . . . to secure payment of the balance of the pur-

chase price of real property, . . . on account of such mortgage or note or obligation secured by the same." The mortgage before the court was to a bank, the proceeds of which mortgage were used to pay the vendor for the purchase of the property upon which the mortgage was placed. After quoting the definition of "purchase-money-mortgage" given in 32 Cyclopedia of Law and Procedure, page 1267, " 'A mortgage given, concurrently with a conveyance of land, by the vendee to the vendor, on the same land, to secure the unpaid balance of the purchase price'—citing Black's Law Dictionary," the court said: ". . . the purpose of the law was to encourage and protect the purchaser of real estate, which perchance is made for the purpose of obtaining a home; that it was not the intent of the lawmakers to render it more difficult for such a purchaser to obtain a loan and pay the cash for a home, and receive the benefit of any lower price of the realty that might be made on account of such cash payment; that if the law should be so construed that any one obtaining a loan and giving a real estate mortgage to a third party not the vendor of the land to secure the payment thereof, when it was contemplated that the money so borrowed should be used in payment for the real property purchased at the time, would be executing a mortgage 'to secure payment of the balance of the purchase price of real property,' within the purview of the statute, and that the lender could only look to the property upon a foreclosure proceeding, then the person wishing to purchase a home or other real property would be hampered and his credit impaired, and it might well be said that, 'The last state of that man is worse than the first.' In such event, the beneficent purpose of the law would be thwarted. It must be considered that the bank was not speculating in real estate in the transaction, it was doing a banking business. It was not the purpose or the intent of the law to regulate banking business or the loaning of money. The ordinary transactions of a bank do not come within the provisions of the act."

Ainsworth has cited no cases which hold to the contrary. In *Stockton Sav. & Loan Bank* v. *Massanet,* 18 Cal.2d 200 [114 P.2d 592], the deed of trust in question was one given by the vendee to the vendor "as the full purchase price of the property." (P. 209.) In *Winkleman* v. *Sides,* 31 Cal.App.2d 387 [88 P.2d 147], neither the indebtedness nor the security therefor was for the purchase price of real property.

Moreover, even if the deed of trust here could be considered a purchase money one, and if it could be held that the assumption of such an indebtedness alone did not constitute consideration, there was still consideration for the conveyance to plaintiff, inasmuch as the Wilsons were personally liable on the chattel mortgage. At the time the Wilsons obtained title to the property, they executed to the bank, in addition to the deed of trust on the real property, and as additional security for the $186,000, a chattel mortgage covering the furniture, furnishings and other personal property on the premises. Section 580 (b) merely applies to encumbrances on real property. There is no law prohibiting a deficiency judgment under a chattel mortgage given for the purchase price of real property. Therefore, while the bank could not have obtained a personal judgment against Wilson on the deed of trust, it could have done so on the mortgage, if a sale of the real and personal property did not produce sums equal to the indebtedness at the time of sale. (*Mortgage Guarantee Co.* v. *Sampsell*, 51 Cal.App.2d 180 [124 P.2d 353].) Hence the assumption of the indebtedness by plaintiff and its payment would relieve Wilson from a personal judgment under the chattel mortgage.

The judgment and decree are affirmed.

Peters, P. J., and Ward, J., concurred.

A petition for a rehearing was denied December 18, 1948, and appellants' petition for a hearing by the Supreme Court was denied January 13, 1949.