[L. A. Nos. 29520, 29521. In Bank. Oct. 25, 1968.]

TEMPLETON FEED AND GRAIN, Plaintiff and Appellant, v. RALSTON PURINA COMPANY, Defendant and Appellant.

Irmas & Rutter and William A. Rutter for Plaintiff and Appellant.

Spray, Gould & Bowers, John J. Costanzo, Henry E. Kappler and Jean Wunderlich for Defendant and Appellant.

TOBRINER, J. — Plaintiff Templeton Feed and Grain (Templeton), a corporation, brought this action against defendant Ralston Purina Company (Ralston) seeking damages for abuse of process and pleading a common count for money had and received. The jury found in favor of Templeton in the amount of $110,738.56. The trial court granted Ralston's motion for a new trial,[1] unless Templeton consented to a reduction of the verdict to $67,000. Templeton consented to the remission; the trial court entered judgment accordingly. Ralston appeals from the judgment entered, and Templeton appeals insofar as the judgment entered reflects the trial court's failure to instruct the jury on exemplary damages.

On appeal Ralston contends that no substantial evidence supports the jury's verdict in favor of Templeton. It also

---

[1] The trial court specified that "The jury was mislead [sic] on the question of punative [sic] damages, and, the verdict was excessive in the Court's opinion." We do not consider whether the trial court adequately stated the reasons for its order (see Code Civ. Proc., § 657; *Mercer* v. *Perez* (1968) 68 Cal.2d 104 [65 Cal.Rptr. 315, 436 P.2d 315]), as Templeton does not challenge the propriety of the order.

urges error in the trial court's instructions to the jury on the issue of damages. Templeton, on its appeal, contends that the trial court erred in failing to instruct the jury that it could award exemplary damages. We conclude that substantial evidence supports the jury's finding for Templeton, but that the trial court erred in instructing the jury on compensatory damages. On Templeton's appeal we hold that Templeton's consent to the remittitur does not preclude it from raising on appeal the trial court's failure to instruct on exemplary damages, and we conclude that the trial court committed error in this regard. We reverse the judgment with directions for a new trial limited to the issue of compensatory and punitive damages.

In aid of its claim and delivery action against Harold and Maureen Livingston to recover possession of personal property, Ralston caused the seizure from the Livingstons' Arroyo Grande ranch of some 35,000 turkeys. (See Code Civ. Proc., §§ 509-511.) Ralston purported to justify the seizure on the ground that a chattel mortgage executed by the Livingstons entitled it to the possession of the turkeys. Templeton, whose ownership of the turkeys rested on an agreement with the Livingstons, paid Ralston the amount of the Livingstons' debt plus interest, thereby obtaining the release of the birds. It then brought the present action.

The evidence before the jury showed that commencing with the year 1958 the Livingstons had raised turkeys on their ranch in Santa Margarita under various financing arrangements with Ralston.[2] In May 1962 the Livingstons executed a chattel mortgage, duly recorded, in favor of Ralston; the mortgage covered "17,000 Broad Breasted Bronze Turkeys and also all future replacements, increase, products, and proceeds thereof, indemnity therefor, things confused therewith, and things of the same kind afterwards acquired." The document stated that the mortgaged property was located on the "premises of H. E. Livingston, State of California, County of San Luis Obispo, Town of Santa Margarita."

The Livingstons' 1962 turkey-raising activities proved to be unsuccessful; at the end of the season they owed Ralston $45,492.60. To secure this obligation they gave Ralston a deed of trust on acreage in Ventura County and on 40 acres of the

---

[2]One such arrangement was the "feeder finance" program under which the creditor furnishes feed and other supplies; another was the "contract grower" program under which the grower is paid for his labor and the "creditor" furnishes the poults in addition to the feed and supplies.

Santa Margarita ranch. Because of the Livingstons' uncertain financial condition Ralston refused to assist in financing a crop of turkeys for 1963. Nevertheless Ralston wanted the Livingstons to continue their operations; the Livingstons were on the verge of filing in bankruptcy; in the event of bankruptcy Ralston could anticipate a loss. Accordingly, Ralston's district representative agreed with the Livingstons and Templeton that Templeton would finance the 1963 crop and Ralston would "leave the birds alone."

The Livingstons' 1963 crop, financed by Templeton, was unsuccessful; the Livingstons were unable to reduce their debt to Ralston. In early 1964 the Livingstons again sought financing from Ralston for the 1964 crop, but Ralston refused. Harold Livingston then told Ralston that he would seek financing from Templeton. He did in fact make such arrangements, and Templeton delivered 111,000 poults to the Livingstons' Arroyo Grande ranch in April 1964.

Beginning in May 1964 Ralston's credit office in St. Louis exhibited renewed interest in collecting the debt owed by the Livingstons. In correspondence and other communication with the Livingstons, their attorney, and their accountant, Ralston referred to the 1962 chattel mortgage but did not threaten any action on that basis. Although Ralston's district representative knew that Templeton was financing the growing operations, no one informed Templeton that Ralston asserted any interest in the 1964 crop.

On November 4, 1964, Ralston filed a "Complaint for Possession of Property" against the Livingstons; it alleged that Ralston was entitled to possession of 17,000 turkeys and replacements and increase under the 1962 chattel mortgage. Ralston instructed the sheriff to seize all turkeys on the Livingstons' Arroyo Grande ranch. On November 9, 1964, in the middle of the Thanksgiving marketing season, the sheriff seized about 35,000 turkeys from the ranch. Anxious to market the turkeys, which were worth $152,000, Templeton, after the seizure, paid Ralston $53,098.55, the amount of the Livingstons' debt plus interest.

1. *Substantial evidence supports the jury's verdict against Ralston for abuse of process.*

Ralston contends that no substantial evidence supports the finding that it committed an abuse of process. ■ In *Spellens* v. *Spellens* (1957) 49 Cal.2d 210, 232 [317 P.2d 613], the

court sets out the essential elements of this tort as stated in Prosser on Torts (2d ed.) at page 667: " 'first, an ulterior purpose, and second, a wilful act in the use of the process not proper in the regular conduct of the proceeding. Some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process, is required; and there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions. The improper purpose *usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself,* such as the *surrender of property or the payment of money, by the use of the process as a threat or a club.* There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort." (Italics in opinion.) (See *Kyne* v. *Eustice* (1963) 215 Cal.App.2d 627, 632 [30 Cal.Rptr. 391]; *Tellefsen* v. *Key System Transit Lines* (1961) 198 Cal.App.2d 611, 614-615 [17 Cal.Rptr. 919].)

The trial court properly instructed the jury as to the elements of abuse of process, and, as we shall explain, substantial evidence supports the jury's finding that Ralston had committed the tort. The jury properly could have found that Ralston, in procuring the seizure, knew or should have known that it was not entitled to possession of the turkeys and that Ralston had seized the turkeys in order to force Templeton, the owner of the birds, to discharge Livingston's debt.

As to Ralston's claim of the right to possession of the turkeys under the terms of the 1962 chattel mortgage, the trial court correctly ruled that the after-acquired property clause in the mortgage did not give Ralston a security interest in the seized turkeys. Former Civil Code section 2977,[3] authorizing mortgages on livestock and other animate chattels, title to which is subsequently acquired by the debtor, provided that "it shall be a sufficient description of such livestock, or other animate chattels, if . . . the place where the same will ordinarily located while owned by the mortgagor . . . [is] stated in such mortgage. . . ." The chattel mort-

---

[3]The Legislature repealed the section effective January 1, 1965, in connection with the enactment of the Commercial Code. As the transactions in question occurred prior to the effective date of the Commercial Code we look to the former law to determine the rights of the parties. (Com. Code, §§ 10101, 10102.)

gage stated the location of the turkeys to be the Livingstons' Santa Margarita ranch, whereas the seizure of the turkeys in 1964 occurred at the Arroyo Grande ranch. Ralston knew at the time the Livingstons executed the chattel mortgage that they raised turkeys on both the Santa Margarita and Arroyo Grande ranches. The 1962 chattel mortgage, therefore, did not purport to cover turkeys raised by the debtor on premises other than those described in the mortgage (see *Witt* v. *Milton* (1957) 147 Cal.App.2d 554, 555-557 [305 P.2d 944]), and the jury could properly have concluded that Ralston knew that the chattel mortgage did not give it a right to possession of the turkeys on the Arroyo Grande ranch.[4]

▇▇▇ Moreover, the jury could properly have found that Ralston knew that Templeton possessed an interest in the turkeys and knew or should have known that such interest emanated from the "contract grower" (see fn. 2, *supra*) arrangement with the Livingstons. The jury could properly infer from this evidence that Ralston wilfully obtained the issuance of process, to which it knew it had no right, for the ulterior purpose of forcing Templeton to discharge the Livingstons' debt. Thus Ralston seized the turkeys at the height of the Thanksgiving marketing season and immediately entered into negotiations with Templeton as to the terms of their release. Substantial evidence supports a finding of abuse of process. (*Spellens* v. *Spellens, supra,* 49 Cal.2d 210, 230; *Peterson* v. *Wilson* (1948) 88 Cal.App.2d 617, 629 [199 P.2d 757, 6 A.LR..2d 258] (disapproved on other grounds in *Freedland* v. *Greco* (1955) 45 Cal.2d 462, 466 [289 P.2d 463], and in *Bargioni* v. *Hill* (1961) 59 Cal.2d 121, 123 [28 Cal. Rptr. 321, 378 P.2d 593]); cf. *White Lighting Co.* v. *Wolfson* (1968) 68 Cal.2d 336, 350, fn. 7 [66 Cal.Rptr. 697, 438 P.2d 345].)

---

[4]Ralston complains of the trial court's instruction that "It is no defense to an action for damages based on the defendant's wrongful act, that the result sought by said action could have been obtained in some other nonwrongful manner." Ralston urges that it could legitimately accomplish by attachment, in connection with an action to recover the debt (Code Civ. Proc., § 537 et seq.), the result in fact achieved by use of the claim and delivery procedure (Code Civ. Proc., § 509 et seq.). As we have pointed out, however, Ralston could claim no security interest in the turkeys under its 1962 chattel mortgage; since the Livingstons' debt was secured by deeds of trust on real property, Ralston would have no right to use the attachment process without first foreclosing on the deeds of trust. (Code Civ. Proc., §§ 537, 726.)

2. *The trial court erred in its instruction on compensatory damages.*

The trial court instructed the jury that "in an action for abuse of process, plaintiff is entitled to recover for mental suffering proved to have proximately resulted from the defendant's wrongful act." We find no ground for such an instruction. Plaintiff Templeton, a corporation, does not seriously urge that it, a corporate entity, can sustain mental suffering. Instead, Templeton argues that it can recover for the mental suffering of Thomas Jermin, an officer and director of the corporation, insofar as that suffering affected Jermin's ability to serve it, thereby damaging it. (Cf. *Darmour Productions Corp.* v. *Herbert M. Baruch Corp.* (1933) 135 Cal. App. 351 [27 P.2d 664].) The trial court, however, did not instruct the jury on any such theory; the instruction actually rendered cannot be supported.

3. *Templeton's consent to the remittitur does not preclude it from appealing from the judgment and raising the issue of the trial court's erroneous instruction on exemplary damages.*

We turn to an appraisal of the crucial issue raised by Templeton's cross-appeal: whether Templeton's consent to the remittitur precludes it from appealing from the judgment entered pursuant to it.

Plaintiff's election to accept the trial court's conditional order for a new trial does not bar plaintiff, upon defendant's appeal, from cross-appealing upon the severable issue of plaintiff's claimed exemplary damages. Although "ordinarily a party cannot accept the benefits of a judgment, in whole or in part and then attack it by appeal" (3 Witkin, Cal. Procedure (1954) Appeal, § 41), a party may take the benefits of the determination of one issue and appeal from another severable part of the judgment. Thus the severability doctrine applies to "cases wherein the appeal is limited to a specific and severable portion of the judgment under circumstances such that the portion of the judgment appealed from can be reversed without affecting the right of the appellant to retain the fruits which he has theretofore received and retained from the other portions of the judgment not appealed from." (*Preluzsky* v. *Pacific Coop. Cafeteria Co.* (1925) 195 Cal. 290, 293-294 [232 P. 970]; see 3 Witkin, Cal. Procedure (1954) Appeal, §§ 42, 43.)

*A fortiori,* a party does not waive his right to appeal as to a severable issue merely because his consent to the judg-

ment as entered, upon which the alleged waiver rests, has been manifested by his written remittitur rather than by an actual acceptance and enjoyment of the benefits awarded by the judgment.[5] Following the principles outlined above we point out that plaintiff, in accepting the alternative of remittitur as to the amount of compensatory damages, did not thereby waive its right to appeal on the issue of the trial court's refusal to instruct the jury on punitive damages. The correction of the error urged by plaintiff (failure to instruct on exemplary damages) would not itself necessitate the reopening of the entire judgment.

 As we said in *Brewer* v. *Second Baptist Church* (1948) 32 Cal.2d 791, 801 [197 P.2d 713]: "The appellate courts have power to order a retrial on a limited issue, if that issue can be separately tried without such confusion or uncertainty as would amount to a denial of a fair trial." We further pointed out, "The *issue of exemplary damages* is separate and distinct from that of actual damages, for they are assessed to punish the defendant and not to compensate for any loss suffered by the plaintiff." (Italics added.) Other cases illustrating the principle that acceptance of the benefits does not bar an appeal as to non-interdependent issues are *Ariana* v. *Parker* (1966) 239 Cal.App.2d 524, 529 [48 Cal. Rptr. 834] (items in partnership accounting); *Mears* v. *Mears* (1960) 180 Cal.App.2d 484, 509 [4 Cal.Rptr. 618] (whether specific items are community property); *People* v. *Roath* (1944) 62 Cal.App.2d 241, 244-245 [144 P.2d 648] (expenses in connection with collection of tax delinquencies); *Swall* v. *Anderson* (1943) 60 Cal.App.2d 825, 827 [141 P.2d 912] (treble damages).

---

[5]Indeed, in a case such as the instant one in which defendant appeals from the judgment, the remitting plaintiff not only faces continued litigation at the appellate and, perhaps, trial stages, a result he may have sought to avoid by his consent, but also ordinarily does not enjoy, pending determination of the appeal, the fruits of the judgment awarded him. Under such circumstances no possibility arises that the plaintiff may retain the benefits of the judgment and obtain still another recovery in a new trial following an unqualified reversal or avoid detriments incidental to the earlier judgment. (Cf. *Preluzsky* v. *Pacific Coop. Cafeteria Co., supra,* 195 Cal. 290, 294.)

These considerations recently led the Supreme Court of Wisconsin to adopt the rule that, when defendant has appealed from the judgment, the remitting plaintiff may appeal from the trial court's resolution of the issue of damages. (*Pleski* v. *Milwaukee* (1963) 19 Wis.2d 210 [120 N.W.2d 130, 16 A.L.R.3d 1315]; see also 16 A.L.R.3d 1327, 1332-1337, discussing state statutes giving the remitting plaintiff the right to appeal when the defendant does so.)

Although defendant relies heavily on two decisions of the District Court of Appeal: *Conlin* v. *Southern Pac. R.R. Co.* (1919) 40 Cal.App. 743 [182 P. 71], and *Fairfield* v. *American Photocopy Equipment Co.* (1958) 158 Cal.App.2d 53 [322 P.2d 93], we do not find them persuasive authority. In *Conlin* plaintiff brought an action for damages for the taking of property. The trial court refused to instruct the jury to include in its award interest from the date of taking. The jury returned a verdict for plaintiff for $23,340. The trial court ordered a new trial unless plaintiff consented to remit the judgment in excess of $15,560. Plaintiff accepted the remittitur, the trial court entered judgment accordingly, and both parties appealed. On plaintiff's appeal the court refused to consider his argument that the judgment should be modified to include interest on the award; the court held that the filing of the remittitur constituted an acceptance of the judgment as modified.

In *Fairfield* the trial court entered judgment that plaintiff was entitled to compensatory and punitive damages. On defendant's motion for a new trial the court ordered a new trial unless plaintiff agreed to remit the punitive damages. Plaintiff filed the remittitur and both parties appealed. The court followed *Conlin* and held that by agreeing to a reduction of the verdict plaintiff waived his right to appeal on the subject of punitive damages.[6] *Roth* v. *Shell Oil Co.* (1960) 185 Cal.App.2d 676, 680 [8 Cal.Rptr. 514], also states, following *Conlin,* that a plaintiff filing a remittitur thereby "waives any right to appeal."

Cases subsequent to *Conlin,* however, have properly applied the appropriate general principles which we have discussed *supra.* We cite one example of that application, which, indeed, pertains to the subject matter involved in *Conlin*: the allowance of interest. This court has held that the appellant's acceptance of the benefits of the judgment did not preclude him from appealing on the separate, severable ground that the

---

[6]In *Fairfield* the court points out that the trial court followed an improper procedure in ordering a new trial unless plaintiff agreed to remit the punitive damages: ''the proper procedure would have been for the court, in ruling on the motion for new trial, to change its findings by finding that defendant had not been guilty of oppression, fraud or malice, express or implied (Civ. Code, § 3294), and to modify its judgment so as to award plaintiff only compensatory damages . . . .'' If the trial court had followed the correct procedure no question as to plaintiff's consent to the judgment as entered would have arisen.

trial court erroneously failed to allow interest on the amount of the judgment. (*Estate of Hubbell* (1932) 216 Cal. 574, 577 [15 P.2d 503]; *Blum* v. *City & County of San Francisco* (1962) 200 Cal.App.2d 639, 650 [19 Cal.Rptr. 574].) **[7b]** *Conlin*, therefore, reached the wrong result; although the court there properly looked to the principles above stated, it misapplied them; accordingly, it is disapproved. We likewise disapprove the two cases following *Conlin*: *Fairfield* v. *American Photocopy Equipment Co., supra,* 158 Cal.App.2d 53, and *Roth* v. *Shell Oil Co., supra,* 185 Cal.App.2d 676.

Furthermore, we have held that "[i]n order to bar the right of appeal on the ground of acquiescence, 'the acts relied upon must be such as to clearly and unmistakably show acquiescence, and it must be unconditional, voluntary, and absolute. And, where a judgment or decree relates to two or more distinct matters or demands, acquiescence therein as to one of such matters or demands will not bar an appeal as to the others.' " (*Duncan* v. *Duncan* (1918) 175 Cal. 693, 695 [167 P. 141]. ▪ We cannot assume in the instant case that plaintiff, in agreeing to the remittitur, also acquiesced in the trial court's separate and distinct denial of plaintiff's right to recover punitive damages.

4. *The trial court erred in failing to instruct the jury that it could award Templeton exemplary damages.*

▪ Considering the merits of Templeton's cross-appeal, we conclude that the trial court should have instructed the jury that it could award plaintiff exemplary damages if it found that defendant had wilfully acted with the wrongful intention of injuring plaintiff and from improper or evil motives amounting to malice. (See Civ. Code, § 3294.)

Templeton presented sufficient evidence to indicate that Ralston had deliberately abused the process of the court with the intention of injuring Templeton or with reckless disregard of the consequences to Templeton. (*Toole* v. *Richardson-Merrell Inc.* (1967) 251 Cal.App.2d 689, 713 [60 Cal.Rptr. 398]; see *Davis* v. *Hearst* (1911) 160 Cal. 143, 167-168 [116 P. 530]; Code Civ. Proc., § 1962.) Thus in *Spellens* v. *Spellens, supra,* 49 Cal.2d 210, we sustained the trial court's award of exemplary damages in connection with an abuse of process action; in that case defendant had used the claim and delivery writ in order to coerce plaintiff to drop another action against him; we stated that "malice may be inferred

from defendant's conduct, if it is required, in such an action or to make a case for punitive damages.'' (P. 230.)[7]

The judgment is reversed with directions for a new trial limited to the issue of compensatory and exemplary damages. Each party shall bear its own costs on appeal.

Traynor, C. J., McComb, J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

---

[7]Ralston contends that because it acted on the advice of counsel in instituting the claim and delivery action it cannot have entertained the requisite malice. Advice of counsel may constitute a defense to the charge of malice if the defendant has fully disclosed the relevant facts to his attorney. (*Wolfsen* v. *Hathaway* (1948) 32 Cal.2d 632, 649 [198 P.2d 1]; *Moore* v. *Durrer* (1932) 127 Cal.App. 759, 767 [16 P.2d 676].) In the instant case Templeton's evidence indicated that Ralston did not make such disclosure.