[Civ. No. 11323. Fourth Dist., Div. One. Apr. 5, 1974.]

DAWN PEASE et al., Plaintiffs and Appellants, v.
BEECH AIRCRAFT CORPORATION, Defendant and Appellant.

## COUNSEL

C. Douglas Alford, Ned Good, Luce, Forward, Hamilton & Scripps, Marshall L. Foreman, Jr.; Robert N. Cleaves, Magana & Cathcart and Daniel C. Cathcart for Plaintiffs and Appellants.

Gibson, Dunn & Crutcher, Kirtland & Packard, Morris & Polich and Landon Morris for Defendant and Appellant.

## OPINION

**WHELAN, Acting P. J.**—There are involved here cross-appeals by the respective plaintiffs in five different actions consolidated for trial, and by the single defendant against which judgment was entered in those five actions.

All five actions arose out of the crash and destruction of an aircraft manufactured by defendant Beech Aircraft Corporation (Beech). In that crash Roy W. Gregory, Jr., pilot of the airplane, and his passengers, Donald Pease, Gaylord Warnick and Calvin Martin Evelhoch, were killed.

The plaintiffs in four of the actions were heirs respectively of the four named decedents; plaintiff in the fifth action was Fletcher Jones, doing business as Westerly Stud Farms, owner of the aircraft, who had purchased it new from Norm Larson Beechcraft (Larson), distributor for the manufacturer.

Jones and the estate of Gregory had also been defendants in the Pease, Warnick and Evelhoch actions until dismissed as mentioned hereafter.

The airplane crashed at the Fullerton airport on June 25, 1968, at approximately 1:27 p.m.

In a jury trial in the Superior Court of Orange County, verdicts against Beech were returned on June 4, 1971, in the following amounts in favor of:

| Plaintiff | Compensatory Damages | Punitive Damages |
| --- | --- | --- |
| Pease heirs | $ 1,000,000 | $ 3,450,000 |
| Evelhoch heirs | 1,250,000 | 3,450,000 |
| Warnick heirs | 165,000 | 3,450,000 |
| Gregory heirs | 2,000,000 | 3,450,000 |
| Fletcher Jones | 82,000 | 3,450,000 |

There was a verdict in favor of Pacific Indemnity Company, a workmen's compensation carrier for Pease's employer, which had paid a death benefit on Pease. There was a verdict in favor of Larson, which had been made a defendant.

The trial court, on August 23, 1971, granted Beech's motion for new trial as to each of the awards of punitive damages on the ground there had been error in instructing the jury, and on the ground the damages were excessive. The court granted a new trial as to the award of compensatory damages as to each of the four sets of heirs upon the latter ground, unless those plaintiffs would accept reductions in the following amounts respectively:

| | |
| --- | --- |
| Pease heirs | $ 500,000 |
| Evolhoch heirs | 750,000 |
| Warnick heirs | 90,000 |
| Gregory heirs | 1,250,000 |

The motions for new trial were denied as to all other grounds urged.

On August 25, 1971, the trial court filed a specification of its reasons

for holding the damages excessive. On the same day, each of the four sets of heirs filed a written consent to a reduction of damages in the amount specified by the court.

Beech has appealed from the judgments, from an order denying its motion for judgment notwithstanding the verdict, and from the order fixing the amounts of the reductions consented to by plaintiff heirs.

Each set of plaintiffs has appealed from the order granting a new trial as to punitive damages, and from the conditional order granting or denying a new trial.

The determinative issues presented by Beech's appeal are these:

1. Was there substantial evidence to support a verdict imposing liability upon Beech?

Subordinate to that issue are the claims the verdicts imposing liability for compensatory damages were the result of a wrongful interjection of the issue as to punitive damages based upon alleged fraud; that it cannot be determined from the verdict for compensatory damages whether it was based upon a finding of fraud or upon strict products liability; and that an erroneous instruction as to the elements of fraud necessarily vitiated all the verdicts.

2. If none of the decedents had a cause of action that survived his death, could there be an award of punitive damages in favor of his heirs?

3. Was there substantial evidence upon which an award of punitive damages could be made in favor of any of the plaintiffs?

4. May punitive damages be awarded against a corporation?

5. Was it error not to inform the jury that agreements had been made between Jones and the administratrix of the Gregory estate on one side, and on the other side the Pease heirs, the Evelhoch heirs and the Warnick heirs, by which each of those three latter sets of heirs agreed to give dismissals, not to be construed or considered as retraxits, of their respective causes of action against Jones and the Gregory estate in consideration of the promise of the two latter, in the event recovery from Beech did not equal amounts stipulated as to each set of heirs respectively, to pay the respective deficiencies up to the total of the amounts respectively stipulated?

The cross-appeals from the order granting new trial require resolution of these issues:

(a) Whether there was error in the jury instruction on fraud which justified setting aside the awards of punitive damages on that ground.

(b) Whether the plaintiffs may appeal from an order conditionally granting a new trial unless remittiturs are consented to, when such remittiturs have been consented to.

Because of our holding as to certain of the issues it has become unnecessary to deal with the questions whether there was error in permitting the plaintiffs to amend their complaints to add causes of action for fraud, and after verdict to amend the prayers for punitive damages to equal the amounts of the verdicts; whether, in granting a new trial as to punitive damages and a conditional new trial as to compensatory damages, the trial court's specifications of reasons were sufficient to satisfy the statutory requirement.

As to the time and cause of the deaths of Gregory, Pease, Warnick and Evelhoch, it was stipulated "they died as a result of this accident and in this accident."

The crash of the airplane was the last incident in the following sequence:

On the day of the crash, Gregory picked up the airplane at the Fullerton airport in order to flight-test newly installed radio equipment. On board the airplane for the test flight with Gregory were: Pease (a radio mechanic of Aviation Communications [Aviation]), Warnick (owner and operator of Aviation), and Evelhoch.

At approximately 1:13 p.m., the aircraft was cleared by the FAA ground controller at the Fullerton airport to taxi from the Aviation radio shop to runway 24 in preparation for takeoff.

At 1:19 p.m. Gregory was told by the air traffic controller at the airport to hold short of the runway. Three minutes later the air traffic controller told Gregory to taxi into position on the runway and hold. Some seconds later Gregory was cleared for takeoff. Gregory then made a ground turn to the left, in order to align himself properly with adjacent runway 24, and proceeded down the runway in a westerly direction.

During acceleration down the runway (while the airplane was still on the ground), unusual engine sounds were heard coming from the craft, which were described as "pops," "erratic sounds," "abnormal or different sounds," and "interruptions in power." Gregory continued his takeoff, although he appeared to settle back toward the runway after initial lift-off, and barely cleared a six-foot chain-link fence at the west end of the runway. The airplane then made a gradual climb to approximately 300 to 400 feet above the ground, then made a slow shallow turn toward the north (a right turn) and climbed to an altitude of 600 to 700 feet, at which point

the right wing dipped (a maneuver which indicated another attempted right turn). Shortly thereafter the airplane went into a spin to the right and spun to the ground.

The aircraft was of a model called the Beechcraft Baron. Jones ordered it in a telephone call in April 1968 to Larson, with which he had done business before; at the same time he ordered a Beechcraft Debonair airplane, which was delivered some time before the Baron. Gregory at that time was the chief pilot for Computer Sciences Corporation (Computer), a corporation of which Jones was chief executive officer and board chairman. Gregory had been employed as a pilot by Computer for four and one-half or five years. During that period he had flown Beechcraft Queenairs, a Baron twin-engine aircraft, as well as other Beechcraft equipment. Jones also had flown a Baron.

On May 17, 1968, Beech completed the Beechcraft Baron airplane, model 95-B55, serial No. TC1101, registered with FAA under the number N8442N, and so informed Jones. Gerald Forston, an employee of Larson, took over the airplane at the Beech factory in Wichita, Kansas, and flew it to California. When Forston obtained the airplane it had three hours of flying time behind it.

Forston flew the aircraft on local flights in Southern California before its delivery to Jones, and on one such occasion experienced a failure of the left engine. At that time the propeller-feathering mechanism on the left engine did not operate properly. The engine was repaired by Larson on June 6, 1968. Following the repairs another Larson employee flew the aircraft for test purposes. After testing the airplane himself, Forston conducted two flights with Gregory to familiarize Gregory with the operation of the aircraft during normal running and emergency situations. Forston instructed Gregory on the use of the particular model of aircraft, including procedures to be followed if an engine failed during takeoff. In Forston's opinion Gregory was an excellent pilot who performed preflight checks scrupulously and who reacted very well to simulated emergencies during the familiarization flights.

The airplane was delivered by Forston to Jones at the Santa Monica airport on June 17, 1968. The price of the airplane delivered to Jones was $67,467.50, which he then paid in full. Forston was next flown in the airplane to the Long Beach airport by Gregory, where Forston noted the fuel gauges indicated approximately one-half full tanks; he did not know whether that indication was for the two main fuel tanks or the two auxiliary fuel tanks installed in the aircraft. It might have been inferred no more fuel was put into the airplane thereafter.

The same day Gregory flew the aircraft to the Fullerton airport. While the aircraft was there Jones had installed in it certain radio equipment which, though new, had been removed from an airplane owned by Computer. The value of that equipment and the cost of installing it totaled $11,436. The radio equipment was installed by Aviation, which sold and serviced equipment installed in aircraft.

The aircraft was not flown again until June 25, when in the morning its engines were run approximately 10 to 15 minutes while the installed radio equipment was being tested. On one other occasion on the same day, prior to the start of the flight in question, the aircraft was taxied approximately 100 yards.

The Baron was a twin-engine monoplane. Its fuel tanks consisted of two 40-gallon fuel cells, which were the primary tanks, and two 31-gallon auxiliary fuel cells. One main and one auxiliary fuel tank were located on each wing and supplied one independent engine on that wing. The main fuel tanks were susceptible to a phenomenon known as "fuel unporting," which means a movement of the fuel within the fuel tank away from a port or outlet located in the aft, inside lower corner of the fuel tank. The port leads the fuel to an engine carburetion unit. When the fuel, due to centrifugal force caused by a turning of the aircraft, moves away from the port, air is sucked into the fuel lines. That air, when it reaches the carburetion system, is injected into the engine, causing engine failure until such time as the turn is completed and subsequent fuel arrives at the engine. However, when fuel does finally reach the engine after prior air has caused its failure, a violent surge of power occurs.

The existence of a condition in the fuel system of the Baron model that in certain circumstances caused fuel starvation had been recognized by Beech not later than March 19, 1968, when a report of its testing stated that the engine, on the outside of a 90-degree turn to a rolling takeoff, malfunctioned with any fuel quantity less than 25 gallons in each tank. The report recommended that information be placed in the flight manual delivered with each airplane. Correspondence with the Federal Aviation Agency as to how the matter should be handled was in progress when Jones obtained his airplane. Written information on the subject intended to warn owners of Baron airplanes was circulated by Beech, but did not reach Jones or Gregory before June 25.

In the opinion of David Holladay, an expert whose qualifications were accepted by the court, that tendency in the aircraft under certain conditions to permit air to enter the fuel line of one of the engines was the cause of

the crash of the airplane. He voiced his opinion in this language: "My opinion is that there was a loss of engine power on take-off subsequently followed by asymmetric thrust condition, which created a spanwise displacement of fuel in the fuel cell, resulting in either partial or complete loss of power in the remaining engine, and that these conditions, when they occurred in a critical portion of the take-off performance by the pilot, presented to him a critical emergency stressful situation which was further complicated by the confusion resulting from the loss of power in more than one engine alternatively, all of which together confronted him with conditions which were beyond the control of even a highly experienced pilot, and from which a recovery was . . . impossible and impact crash was inevitable."

It is only in its reply brief that Beech expounds the claim there was insufficient evidence to submit to the jury the issue of proximate causation based upon the claimed defect in design of the system for storage and feeding of fuel.

Beech earlier took the position that the issue could not fairly have been resolved by the jury because (1) the jury had been erroneously instructed on the issue of fraud, and it could not be known whether the verdicts for compensatory damages were based upon an implied finding of fraud or upon liability for defective products; (2) the issue of fraud, erroneously permitted to enter the case, clearly biased the jury in its determination of the issue of proximate causation.

The evidence was not all one way. It was reasonably to be inferred, however, that the cause of the manifested engine failure was a lack of fuel supply to the right engine. While it is argued that engine failure was the result of the pilot's having connected with the reserve rather than the main tank on the right side, it is equally plausibly argued he did so only because the main tank was not feeding fuel to the engine. The evidence need not be given in detail. We are of opinion it might reasonably have been inferred that the cause of the engine failure was the characteristic of the main fuel tank to allow air into the fuel line in the circumstances that existed during the takeoff, and that the pilot was unaware of that characteristic as related to the quantity of fuel in the tanks.

██ The theory upon which punitive damages were sought by the estates of the four decedents was that personal effects of each of the four were destroyed in the crash of the airplane, and that a cause of action for such loss arose in favor of each of the four decedents during his lifetime which survived him. In view of the stipulation as to the cause and time of the deaths, it must be said no cause of action arose during the lifetime

of any of the four for damage to personal property. Therefore, no such cause of action survived.

In the state of facts assumed by the personal representatives of the four decedents, the possibility of an award of punitive damages finds a basis in Probate Code section 573 as amended in 1961. In relevant part that section provides: "Except as provided in this section no cause of action shall be lost by reason of the death of any person but may be maintained by or against his executor or administrator.

"In an action brought under this section against an executor or administrator all damages may be awarded which might have been recovered against the decedent had he lived except damages awardable under Section 3294 of the Civil Code or other damages imposed primarily for the sake of example and by way of punishing the defendant.

"When a person having a cause of action dies before judgment, the damages recoverable by his executor or administrator are limited to such loss or damage as the decedent sustained or incurred prior to his death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had he lived, and shall not include damages for pain, suffering or disfigurement.

"This section is applicable where a loss or damage occurs simultaneously with or after the death of a person who would have been liable therefor if his death had not preceded or occurred simultaneously with the loss or damage."

■ Under section 573, (1) punitive damages in favor of the personal representative are limited to those sustained or incurred prior to death; (2) punitive damages may not be awarded against a personal representative; (3) if the tortfeasor's death occurs simultaneously with the loss or damage caused by him, the cause of action may be enforced against his estate, but there is no similar provision declaring a survivable cause of action in favor of a decedent whose death occurs simultaneously with the loss of or damage to his personal property.[1]

---

[1]For the benefit of any so error-prone as to find in the foregoing a view that the personal representative of a decedent would have no cause of action for damage to tangible property suffered simultaneously with the death of its owner, we make it clear that the personal representative would have a cause of action whether the damage occurred before, at the same time as, or after the death of the owner; and if it occurred after and was caused by a direct invasion of the right of the personal representative to possession and control of the property free from damage or interference, there might be a right to punitive damages, as in a cause of action arising during the life of the decedent to which the personal representative succeeds.

Such a right properly should be asserted in an action, or in a separate cause of action, distinct from a cause of action for wrongful death, and should result in a separate verdict from one awarding damages for wrongful death.

 It has been suggested, however, by the plaintiffs that we declare a right to recover punitive damages in favor of the four sets of heirs.[2]

They purport to find the existence of such a right, independent of statute, and cite *Moragne* v. *States Marine Lines,* 398 U.S. 375 [26 L.Ed.2d 339, 90 S.Ct. 1772], as the beacon that guided them to that discovery.

In *Moragne,* the court declared there is a cause of action for wrongful death in maritime law, which does not depend upon statute, because the reason for the denial of such a right under the common law has not existed in this country. In doing so, the Supreme Court did not mention punitive damages as an adjunct to the right; nor did it say such a right of action existed apart from statute in the state of Florida. Still less, perhaps, would it exist without statute in California, whose first wrongful death statute was enacted in 1862, following Lord Campbell's Act in 1846 which was said to be its progenitor. (*Buckley* v. *Chadwick,* 45 Cal.2d 183, 194 [288 P.2d 12, 289 P.2d 242].) Before 1862 there was no wrongful death action in this state. (*Buckley* v. *Chadwick, supra,* 45 Cal.2d 183, 190.)

Punitive damages in wrongful death actions are permitted by statute in some states, as in Texas. (See *Kritser* v. *Beech Aircraft Corporation* (5th Cir.) 479 F.2d 1089, 1091.) Their award was permitted in California by statute from 1862 until 1874, when the words "pecuniary and exemplary" were stricken from section 377 of the Code of Civil Procedure.

The purpose of that amendment must have been to take away the right to exemplary damages. (*Lange* v. *Schoettler,* 115 Cal. 388, 391 [47 P. 139].)

The question arose collaterally in *Doak* v. *Superior Court,* 257 Cal. App.2d 825, 837 [65 Cal.Rptr. 193, 27 A.L.R.3d 1362], which followed the holding of *Lange* v. *Schoettler, supra,* 115 Cal. 388.

In *Fox* v. *Oakland Con. St. Ry.,* 118 Cal. 55, 67 [50 P. 25], it was stated that the jury was properly instructed they could not award anything by way of penalty.

The action under the statute since the 1874 amendment is one solely for the purpose of compensating the heirs for the pecuniary loss suffered by them by reason of the death of the deceased, as is demonstrable from decisions declaring the elements of damage. (*Estate of Riccomi,* 185 Cal. 458, 461 [197, P. 97, 14 A.L.R. 509].)

Those elements have had a recent declaration in *Carr* v. *Pacific Tel. Co.,*

---

[2]The amendments to the complaint permitted to allege causes of action upon which punitive damages might be based made no distinction between the right of the heirs to recover for wrongful death, and the right of the personal representatives to recover for the decedents' alleged loss of personal property, the cause of action for which might be for the benefit of creditors or legatees, or heirs who suffered no economic loss.

26 Cal.App.3d 537, 545 [103 Cal.Rptr. 120]: "(1) The present value of future contributions from the decedent to his surviving heirs; (2) the value of any personal service, advice or training that probably would have been given; and (3) the value of the decedent's society and companionship. [Citations.] In the case of the death of a husband and father, the chief element is the present value of the earnings he would have contributed to the family during the period of his life expectancy. [Citation.] These damages are in addition to the recovery which may be sought by the decedent's estate pursuant to the provisions of section 573 of the Probate Code. (Code Civ. Proc., § 377.) The law does not allow recovery for pain or suffering resulting to the deceased or his dependents. [Citation.]"

An additional consideration going to the soundness of the theory punitive damages may be recovered in a wrongful death action is presented in the situation in which a cause of action in favor of a decedent unquestionably survived him which could sustain an award of punitive damages. A claim to punitive damages in favor of the decedent survives under the specific provision of Probate Code section 573; such damages are to punish the wrongdoer. Under the theory of plaintiffs, the heirs, too, should obtain punitive damages to punish the wrongdoer. In all other respects, the damages recoverable under the two separate and different causes of action are mutually exclusive.

We refuse, therefore, to exercise legislative powers to declare a right to punitive damages in favor of the heirs.[3]

It follows that so far as concerns the verdicts for punitive damages in favor of the personal representatives of the estates of the four decedents, there could not have been error in granting the motion for new trial.

Concerning punitive damages, there remains the question whether the verdict in favor of Jones was properly set aside because of a deficient instruction as to fraud.

Among the instructions given were these: "In this action all of the five groups of plaintiffs have sued Beech Aircraft Corporation for damages on two theories: Strict liability and fraud. Three of the five groups of plaintiffs, Pease, Evelhoch and Warnick, have sued Beech on the additional theory of negligence.

"All of the plaintiffs except Warnick have sued Norm Larson Beechcraft for damages on the theory of strict liability. Two of the five plaintiffs,

---

[3]So far as the actions for wrongful death involved in this appeal are concerned, no punitive damages were or could have been awarded under the instructions given. Those actions went to judgment on the theory such damages could not be awarded in a wrongful death action. Should the judgments for compensatory damages be finally affirmed, no punitive damages could ever be awarded in connection with those causes of action.

Pease and Evelhoch, have sued Larson on the additional theory of negligence:

"As to those theories, the respective plaintiffs have the burden of establishing, by a preponderance of the evidence, all of the facts necessary to prove the issue as to those theories, and you'll be instructed as to what the issues are when you're instructed on the law of each theory.

". . . . . . . . . . . . . . . . . .

"You'll now be instructed on the next theory, fraud. The elements of fraud are, and, of course, again, the plaintiffs have the burden to prove these by a preponderance of the evidence: First, false representations, actual or implied, or concealment of a matter of fact material to the transaction made falsely.

"As to the element of concealment of the matter of fact material to the transaction, you are further instructed that one who fails to disclose to another a thing which he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the non-existence of the matter which he has failed to disclose if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

"One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated any subsequently acquired information which he recognizes as making untrue or misleading a previous representation which, when made, was true or believed to be so.

". . . . . . . . . . . . . . . . . .

"If you find that an occupant or the owner of the Baron airplane had personal property damage[d] or destroyed as a proximate result of the acts of defendant Beech on which you base a finding of liability in favor of the personal representative of the deceased occupant or in favor of the owner, you may, in your sole discretion, award additional damages to the personal representative of the deceased occupant or the owner and against defendant Beech Aircraft Corporation only, known as punitive, or exemplary damages, for sake of example and by way of punishing Beech Aircraft Corporation, if you find by a preponderance of the evidence that Beech Aircraft Corporation has been guilty of fraud.

"A claim for wrongful death will not support an award of punitive damages."

No other instruction on the subject of fraud was given.

The trial court, in granting a new trial as to the issue of punitive damages, acknowledged the omission from the instructions of elements essential to a cause of action for fraud.

It is argued the omission of the element of actual and justifiable reliance was of no consequence. We do not agree. We note there are two different points at which the element of reliance might have been important. The action might have been one based upon fraud in the original bargain; there, the point of reliance would have been when Jones ordered the airplane, or perhaps when he paid for it.

The alternative point of reliance was before Jones added value to the airplane and before he put it into operation. Clearly, reliance at the latter point was what resulted in the actual loss suffered. The amendment alleging fraud does not allege any reliance by Jones at a specific time earlier than June 25.

The amendment to the complaint sets out three causes of action, one for fraudulent concealment of a defect, and two for fraudulent misrepresentations. The third of those causes of action is based upon the alleged issuance of an airworthiness certificate on May 21, 1968, which, the complaint alleges, Beech caused to be openly and prominently displayed in the aircraft; and the complaint alleges that in reasonable reliance upon the misrepresentation, Jones owned a Baron aircraft in which the certificate was displayed on June 25, 1968. The alleged nondisclosure was to the defect in design of the fuel tank; and the alleged representation as to airworthiness was false because of that defect.

The sufficiency of the questioned instructions must be considered in relationship to the testimony. Jones testified on March 31 and again on April 14. Among other things, he testified he had been licensed to fly multi-engine airplanes for about six years; he had not flown the airplane involved in the crash, which he saw only one time, at the Santa Monica airport. At that time he observed the airplane had been painted a color different than had been ordered, the upholstery was not the kind that had been ordered, and one of the gauges or instruments was incorrectly mounted. When he bought the airplane, and up to the time of the accident, no representative of Larson or of Beech warned him of any problems with the 40-gallon fuel system or told him to limit the manner or way the airplane was taxied or flown.

When Jones testified for the first time on March 31, he was asked whether, on the only occasion when he saw the airplane, he had any "knowledge, information, suspicion or belief of any fuel flow interruption

situation that might exist in Beech airplanes equipped with 40-gallon fuel cells."

This followed:

"A. No. At that time I had no such information or knowledge.

"Q. I am including now information that you may have received from anyone else in this question.

"A. But prior to the date of inspection of the airplane?

"Q. Yes.

"A. No."

The matter was not touched upon further. No return to the subject was made on April 14 when Jones again took the stand. None of Jones' testimony was given after leave was given to file the amendment to his complaint alleging fraud. The amendment itself was filed May 6, 1971. His March 31 testimony was given when he was still a defendant.

There are allegations in the amendment as to fraud upon the public. Such sweeping allegations might suggest a willful and wanton indifference to the safety of persons who might use the airplane; they are not sufficient to state a cause of action for fraud unless reliance by a specific person is alleged. Such reliance must not only be alleged, but proved. The complaint here alleged the necessary element of reliance (see *Wennerholm* v. *Stanford Univ. Sch. of Med.,* 20 Cal.2d 713, 716 [128 P.2d 522, 141 A.L.R. 1358]), but we cannot know that the jury inferred there was reliance. Although reliance may be inferred by the jury from circumstances, it cannot be said a finding of reliance was made by the jury unless the jury knew such a finding was necessary.

While in a particular action based upon products liability, the elements of a cause of action for fraud may also exist,[4] a cause of action based upon products liability does not necessarily contain all of those elements.

The trial court, therefore, decided correctly that the omission to instruct that reliance was one of the elements of a cause of action for fraud made it necessary to grant a new trial as to punitive damages, which under the instruction given might be based only upon fraud.

We do not decide whether the evidence of fraud was sufficient to submit the issue to the jury.

---

[4] See cases collected in 78 A.L.R.2d 496, 497, and in 75 A.L.R.2d 92.

■ The contention of plaintiffs that Beech was somehow estopped to urge the error in the trial court where a new trial was granted because of the error, or to argue the error in this court, is without merit. Nothing indicates trial counsel for Beech became consciously aware of the court's omission of necessary elements in the court's instructions. Certainly he had no greater duty than counsel for plaintiffs to act as watch-dog in that matter.

■ Beech has also argued that punitive damages should not be awarded against a corporation. In most of the cases in which such damages have been awarded or sought against a corporation, it has been assumed without discussion that a corporation might become liable for such damages. (See *Scott* v. *Times-Mirror Co.,* 181 Cal. 345 [184 P. 672, 12 A.L.R. 1007]; *Bancroft-Whitney Co.* v. *Glen,* 64 Cal.2d 327 [49 Cal.Rptr. 825, 411 P.2d 921, 24 A.L.R.3d 795]; *Lowe* v. *Yolo County etc. Water Co.* 157 Cal. 503 [108 P. 297]; *Lowe* v. *Yolo County etc. Water Co.,* 8 Cal. App. 167 [96 P. 379]; *Greenberg* v. *Western Turf Assn.,* 140 Cal. 357 [73 P. 1050].)

In *Toole* v. *Richardson-Merrell Inc.,* 251 Cal.App.2d 689, 711 [60 Cal.Rptr. 398, 29 A.L.R.3d 988], the question was directly presented and met squarely with an affirmative answer.

Beech raises consideration of the welfare of the affected stockholders as reason for a policy denying a right to punitive damages against a corporation. No sufficient reason appears why shareholders should be seen as captive innocent hostages to the inhuman management of a corporate juggernaut. In this respect a corporation must be held to be a legal person, as it has been held to be in others.

Beech's motion for judgment notwithstanding the verdict was denied. It was grounded on the claimed insufficiency of the evidence to sustain a verdict. In view of our holding, there was no error in denying the motion.

■ Because the instructions on fraud were deficient, Beech argues we are left in doubt whether the verdicts for compensatory damages were based upon the theory of fraud, negligence or products liability, citing *Stockstill* v. *South Laguna Disposal Co.,* 1 Cal.App.3d 1022 [82 Cal.Rptr. 268]. Such a conclusion does not necessarily follow.

Since the plaintiff in an action based upon strict liability is not required to prove he was unaware of the defect that caused the injury (*Luque* v. *McLean,* 8 Cal.3d 136 [104 Cal.Rptr. 443, 501 P.2d 1163]), proof of a cause of action for products liability cannot alone be sufficient to establish fraud based upon alleged concealment or misrepresentation of a condition known to the defendant to exist.

Knowledge by the manufacturer of a defect in its product is not required to fix liability in a products liability case; proof of that element of fraud would not have been necessary to sustain the verdict based upon products liability.

Actual communication to the prospective buyer or user of any representation as to condition is unnecessary to the strict liability cause of action. Even such a representation as amounts to an implied warranty is not called for. Since no representation express or implied is called for in a strict liability cause of action, no intention to induce reliance is called for.

Viewing the instructions as a whole, they present an arrangement of theories which relates the definition of fraud only to an award of punitive damages. The definition of fraud assumed the same aspect to the jury as a definition of malice given to permit the addition of punitive damages. Accordingly, the giving of that insufficient instruction, and the mention of a cause of action for fraud elsewhere in the instructions, did not have the result contended for by Beech.

The evidence is sufficient to support the verdicts for compensatory damages upon the basis of strict liability in tort. Such a misdirection of the jury as that complained of, so far as it affects the verdicts for compensatory damages, does not require a reversal unless there has been a miscarriage of justice (Cal. Const., art. VI, § 13). From an examination of the entire cause, including the evidence, it is our opinion the error complained of has not resulted in a miscarriage of justice insofar as those verdicts in their reduced amounts are concerned.

The case was submitted to the jury on the afternoon of May 27; the jury continued to deliberate on May 28, June 1, 2, 3 and 4, when they returned their verdicts.

Again, viewing the record as a whole, the interjection of the issue of fraud, which we believe the jury reasonably viewed as an additional something for which punitive damages might be awarded, did not overcome the reason of the members of the jury in passing upon the issue of causation.

In ruling upon Beech's motion for new trial, the court made an order which reads in part as follows: "Motion for new trial for excessive compensatory damages is granted as to the Pease, Evelhoch, Warnick and Gregory heirs only, and a new trial is ordered only as to those heirs on the issue of compensatory damages as to the negligence and strict tort counts theories only, subject to the condition that the motion for new trial

for excessive compensatory damages is denied as to those plaintiffs who consent to the following reductions thereof on or before *August 25, 1971:*

| | | |
|---|---|---|
| "Pease heirs: | $ 500,000 | reduction |
| "Warnick heirs: | 90,000 | reduction |
| "Gregory heirs: | 1,250,000 | reduction |
| "Evelhoch heirs: | 750,000 | reduction" |

On August 25, 1971, each of the four sets of heirs, by writings filed with the court, consented to the reductions of the respective verdicts for compensatory damages. The effect of that was a denial of the motion for new trial upon the ground of excessive compensatory damages.

An order denying a motion for new trial is not made appealable by Code of Civil Procedure section 904.1. Under the predecessor statute (repealed § 963, Code Civ. Proc.), such an order is not appealable. (*Singleton* v. *Perry,* 45 Cal.2d 489, 500 [289 P.2d 794]; *Wiedemann* v. *Fox,* 191 Cal.App.2d 812 [13 Cal.Rptr. 161].)

■ The plaintiff heirs, however, contend they may appeal from the trial court's order as though it were an order granting a new trial, for the reason Beech has appealed not only from the judgment but from that portion of the court's order of August 23, 1971, quoted above.

In support of their position, the plaintiff heirs cite the case of *Plesko* v. *City of Milwaukee,* 19 Wis.2d 210 [120 N.W.2d 130, 16 A.L.R.3d 1315], in which the trial court on motion for new trial had offered the plaintiff the option of accepting a reduction of her award of damages from $9,950 to $5,500 in lieu of a new trial on that issue. On appeal by the defendant, it contended the issue of liability had been wrongly resolved against it, but also that the reduced award was excessive. The plaintiff also appealed, contending the amount of $5,500 was insufficient. The Supreme Court of Wisconsin, in upholding the plaintiff's right to appeal in the circumstances, also upheld the trial court's action.[5]

---

[5] In reaching its conclusion, the Wisconsin court said: "In Burmek v. Miller Brewing Co. (1961), 12 Wis 2d 405, 417, 107 NW2d 583, we held that where a plaintiff is given an option to accept a reduced amount of damages or a new trial limited to damages, his acceptance of the reduced damages precludes his seeking a review of the trial court's determination of the damage issue.

"Upon further consideration of the matter a majority of this court conclude that this rule announced in the Burmek Case should be limited to the situation where the party awarded damages appeals. The majority further hold that when an opposing party appeals, the party who has accepted the option to take judgment for such a reduced amount of damages may nevertheless have a review on appeal of the trial court's determination of the damage issue. If it is determined on such review, however, that no error was committed by the trial court's disposition of the damage issue,

Our Supreme Court, in its 1968 decision in *Templeton Feed & Grain* v. *Ralston Purina Co.*, 69 Cal.2d 461 [72 Cal.Rptr. 344, 446 P.2d 152], referred, in a footnote, to the 1963 decision of *Plesko* v. *City of Milwaukee, supra*. Templeton did not deal directly with the question whether a plaintiff, having consented to a reduction of damages, could on appeal attack the trial court's order denying a new trial if such reduction were consented to. The case dealt with a situation in which the defendant appealed from the judgment for compensatory damages on two grounds: nonliability and, a contention sustained by the reviewing court, misdirection of the jury as to the measure of damages. The plaintiff appealed because the trial court refused to instruct that the jury could award exemplary damages. The court stated: "Plaintiff's election to accept the trial court's conditional order for a new trial does not bar plaintiff, upon defendant's appeal, from cross-appealing upon the severable issue of plaintiff's claimed exemplary damages. Although 'ordinarily a party cannot accept the benefits of a judgment, in whole or in part and then attack it by appeal' (3 Witkin, Cal. Procedure (1954) Appeal, § 41), a party may take the benefits of the determination of one issue and appeal from another severable part of the judgment. Thus the severability doctrine applies to 'cases wherein the appeal is limited to a specific and severable portion of the judgment under circumstances such that the portion of the judgment appealed from can be reversed without affecting the right of the appellant to retain the fruits which he has theretofore received and retained from the other portions of the judgment not appealed from.' (*Preluzsky* v. *Pacific Coop. Cafeteria Co.* (1925) 195 Cal. 290, 293-294 . . .)

"*A fortiori,* a party does not waive his right to appeal as to a severable

such party's prior acceptance of judgment for the reduced amount will be affirmed unless the result of the principal appeal requires otherwise.

"The reasons motivating the majority to adopt the foregoing rule are these: The objective underlying the recommended procedure for granting an option to accept judgment for a reduced amount of damages in lieu of having a new trial, where the damages awarded by the jury are determined by the trial court to be excessive, is to avoid the delay and expense of an appeal or a new trial. In most situations, it is likely that the party will accept judgment for such reduced damages rather than undergo the expense, delay, and uncertainty of result of an appeal or new trial. Nevertheless, if a party found liable to pay damages appeals the judgment resulting from the other party's accepting such reduced damages, this objective has been negatived. When plaintiff is forced to undergo an appeal by the action of an opposing party, after plaintiff has accepted judgment for such reduced damages, it seems unfair to prevent his having a review of the trial court's determination leading to the reduction in damages, especially if plaintiff has accepted same only to avoid the delay and expense attending an appeal. Furthermore, the new rule herein announced may to some extent discourage appeals by the party held liable because of the possibility that the party who has accepted judgment for the reduced damages may prevail on his motion for review and have the jury's verdict reinstated." (16 A.L.R.3d at pp. 1324-1325.)

issue merely because his consent to the judgment as entered, upon which the alleged waiver rests, has been manifested by his written remittitur rather than by an actual acceptance and enjoyment of the benefits awarded by the judgment. Following the principles outlined above we point out that plaintiff, in accepting the alternative of remittitur as to the amount of compensatory damages, did not thereby waive its right to appeal on the issue of the trial court's refusal to instruct the jury on punitive damages. The correction of the error urged by plaintiff (failure to instruct on exemplary damages) would not itself necessitate the reopening of the entire judgment." (Pp. 468-469.)

The result was an order for a new trial as to compensatory damages on the defendant's appeal, and as to exemplary damages on the plaintiff's appeal.

Here, neither party has a right to appeal from the order denying a new trial as to compensatory damages. As far as Beech is concerned, it makes no attack upon the amounts of compensatory damages which plaintiff heirs consented to. The heirs, in their appeal from the August 23 order, as it dealt with compensatory damages, claim only that the specification of reasons given by the judge for holding the verdicts excessive did not meet the statutory requirements, with the hoped-for result the jury's verdicts would be restored; and do not claim that the amounts of the awards resulting from the reductions were inadequate. A review of the evidence as to monetary loss suffered shows that the reduced awards were substantially in excess of the economic loss suffered by the heirs, as testified to by an expert witness on behalf of the plaintiffs, and other evidence. In the case of Gregory and Evelhoch, the reduced awards were twice the amounts of the economic loss testified to.

The plaintiffs had the right to appeal the granting of a new trial as to punitive damages, although they knew of the making of that order when they consented to the reduction of compensatory damages. Since the two issues were severable (*Templeton Feed & Grain* v. *Ralston Purina Co.*, *supra*, 69 Cal.2d 461), a case such as *Spencer* v. *Nelson*, 30 Cal.2d 162 [180 P.2d 886], has no application.

Finally, the trial court's specifications of reasons for the conditional order satisfy the requirements of Code of Civil Procedure section 657.

■■■ It was disclosed in the record on April 13, 1971, that the heirs in one or more of the actions had entered into an agreement with the defendants in those actions other than Beech and Larson, which in the case of the Warnick heirs read as follows: "The defendants Estate of

Gregory, Computer Sciences, Inc., and Fletcher Jones, dba Westerly Stud Farms, have made the following proposal to said [Warnick] minor plaintiffs:

"1. That in exchange for a dismissal of the action as to said defendants, said dismissal not to be construed or treated as a retraxit, said plaintiffs will proceed against defendant Beech Aircraft Corporation and, in the event of a defense verdict, the above mentioned parties will pay the sum of $60,000.00 to said minors.

"2. In the event a verdict is entered in favor of said minor plaintiffs and against Beech Aircraft Corporation in a sum less than $60,000.00, said parties will contribute such sums as are necessary to assure said minors of a total recovery of $60,000.00.

"3. If a verdict is rendered in favor of the minor plaintiffs herein and against defendant Beech Aircraft Corporation in the sum of $60,000.00 or more, said parties will pay nothing to the minor plaintiffs herein.

"4. That in the event of an offer to compromise by the remaining defendant or defendants which would obligate defendants Gregory, Computer Sciences, Inc. and Fletcher Jones to pay moneys, the representatives of said parties will be first consulted." That agreement received court approval on behalf of the Warnick minor heirs on May 24, 1971.

Similar agreements, differing in the amounts conditionally agreed to be paid, were made by the Pease heirs and the Evelhoch heirs. The Pease agreement was approved on behalf of the minor heirs on May 27, 1971.

Beech questioned the validity and effect of such agreements by way of affirmative defense. Because no evidence was allowed in, nor any instruction given with regard to the conditionally guaranteed settlement sums, the jury was unaware of them. Beech argues, under the recent authority of *River Garden Farms, Inc.* v. *Superior Court,* 26 Cal.App.3d 986 [103 Cal.Rptr. 498], it was entitled to have the trier of fact determine, after hearing relevant evidence, if Beech were entitled to a set-off in the amount of the guaranteed settlements and whether Gregory and Jones entered into the agreements in bad faith.

Beech argues additionally it was fundamentally unfair that Beech should be made the sole target of the fire not only of the three sets of heirs who had given the agreements to dismiss as to Gregory's estate and Jones, but also to that of the two latter in their roles as plaintiffs. That claimed unfairness was magnified, it is asserted, because counsel for the Pease heirs had earlier been strong and clear in his denunciation of alleged

manifold acts of negligence of the pilot, while after the making of the agreements he was able to concentrate on Beech alone. What was said in *Thornton* v. *Luce,* 209 Cal.App.2d 542, 551 [26 Cal.Rptr. 393], is apropos. "[A]ppellants had no standing in the trial court entitling them to object to the dismissal granted their codefendants. . . .

". . . Absent some special relationship between the parties, other than their potential liability as joint tort-feasors, a plaintiff should be able to control his case by proceeding against the party or parties whom he feels to be most clearly liable."

It is argued further the jury must or might have inferred, from having been told Jones and the Gregory estate were no longer defendants, that the court had found them free from negligence.

The method by which the jury was informed Jones and the Gregory estate were no longer parties defendant has been approved in other cases. (*Cseri* v. *D'Amore,* 232 Cal.App.2d 622, 624-625 [43 Cal.Rptr. 36].)

■ It is reversible error, in a jury trial, to receive evidence of a settlement made with a joint tortfeasor, the making of which and the amount of which are communicated to the court and interested parties, so that there is no issue of fact to be resolved by the jury in connection with the settlement. (*Albrecht* v. *Broughton,* 6 Cal.App.3d 173, 178 [85 Cal.Rptr. 659];[6] *Shepherd* v. *Walley,* 28 Cal.App.3d 1079, 1082 [105 Cal.Rptr. 387].)

In *Laurenzi* v. *Vranizan,* 25 Cal.2d 806, 813 [155 P.2d 633], decided in 1945, it was held proper to admit evidence of the amount paid by a

---

[6]"Respondent seems to claim a vested interest in having the jury made aware of the fact of a settlement and of its amount. No doubt respondent's counsel was correct in believing that it was tactically advantageous for him to be able to bring this information to the jury in a case where the evidence on liability was in sharp conflict and the damages were so severe. There can be no question that it was a great advantage to the defense to be able to let the jury know that appellant's injuries were not wholly uncompensated. But that advantage is not one which a party is *entitled* to enjoy in the absence of any issue in the determination of which the evidence will be relevant and proper for the jury to hear. The situation is closely analogous to an admission of liability by a defendant. Such an admission precludes the introduction of evidence of liability unless it is relevant to some distinct issue remaining in the case. [Citations.] That is so even though, as in *Fuentes, supra,* the party offering the evidence is deprived of an important tactical advantage. Indeed, where the evidence is not relevant to any real issue, the advantage sought to be gained by its presentation must be recognized as unfair. Each side takes the risk that the 'picture' of the case seen by the jury may be an unfavorable decisional context. But neither side is entitled to litigate a nonexistent issue for no purpose other than to alter the decisional context in his favor. It was error to refuse to accept appellant's admission and to receive evidence of the settlement."

defendant jointly charged in a tort action for a dismissal. That was before the enactment of Code of Civil Procedure section 877. The adoption of the latter section in 1957, in the event of a settlement for an admitted amount, permitted the court to make a reduction in the amount of a verdict based upon the amount of such settlement.

Here, there was no amount or consideration actually paid, and the amounts agreed to be paid conditionally could not be deducted from the verdicts. The jury could not place a value on the agreements for the conditional payments, nor could they reasonably consider those agreements as evidence on the issue of liability or as to the amount of damages sustained. The agreements were properly excluded from consideration by the jury.

The question here should be resolved within the totality of circumstances. Among those controlling circumstances is the fact that the Gregory estate and Jones were plaintiffs in actions against Beech arising out of the same accident. In its answer to the respective complaints of Gregory and Jones, Beech alleged as a defense the contributory negligence of Gregory, the agent or employee of Jones, who operated the airplane with the consent of Jones. The jury found against Beech on that issue as to each of those plaintiffs. Beech, therefore, has not been deprived of anything it would have been entitled to if the case had proceeded to verdict in the actions against Jones and Gregory. Beech was not denied the opportunity to show the accident was not the result of any fault on its part; nor was it denied the opportunity of showing negligence on the part of Gregory which would have been attributed also to Jones, merely because it did not have the assistance of Evelhoch, Warnick and Pease in that endeavor. Beech may engage in the supposition the verdicts might have been otherwise if Jones and Gregory had remained as defendants. The situation is no different than if they had never been named defendants.

In *River Garden Farms, Inc.* v. *Superior Court, supra,* 26 Cal.App.3d 986, the action against River Garden Farms had not yet been tried. As the employer of the deceased father, River Garden Farms could not be subjected to liability for his death, but might be found liable for the death of the wife and the injuries to the two surviving children. The settlements made by the other defendants were apportioned by the plaintiff children excessively toward the cause of action for wrongful death of the two parents, so that in the event of verdicts against River Garden Farms, the sole remaining defendant, the potentially larger verdicts for injuries to the children would receive the least credit from the amounts of the settlements, and the potentially lesser verdict for wrongful death of the mother, the larger credit.

There was not present here that element found in *Pellett* v. *Sonotone Corp.*, 26 Cal.2d 705 [160 P.2d 783, 160 A.L.R. 863], by which the defendant, with whom an agreement for settlement had been made by the plaintiff, testified in the first trial favorably to the plaintiff while appearing to be an adversary. Gregory was dead and the testimony given by Jones after the agreements had been made could have had no value in determining the cause of the accident.

The trial judge was capable of determining whether there had been bad faith in the making of the settlement agreements. It was he who approved the proposed settlements on behalf of several of the plaintiff minor heirs after all the evidence had been presented in the trial. As stated in *River Garden Farms, Inc.* v. *Superior Court, supra,* 26 Cal.App.3d 986, 998: "Good or bad faith is a question of fact in each case. [Citation.] Only a trial court may reach a decision, guided by the evidentiary material presented to it."

The judgments are affirmed; the order granting a new trial on the issue of punitive damages is affirmed, which on retrial will be limited to the action by Jones; the appeals from the conditional order, which, by reason of the fulfillment of the condition has become an order denying a new trial as to compensatory damages, are dismissed. Each party shall bear its own costs of appeal.[7]

Ault, J., and Cologne, J., concurred.

A petition for a rehearing was denied April 26, 1974, and the opinion was modified to read as printed above. The petition of the plaintiffs and appellants for a hearing by the Supreme Court was denied June 19, 1974.

---

[7]The record on appeal has been most wastefully compiled. The clerk's transcripts run to more than 7,900 pages, including material that is reproduced as many as five times, and much of it made up of matters wholly immaterial to the appeals.